UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, AFL–CIO, an unincorporated association, and United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO, Local 102, an unincorporated association, Plaintiffs,

v.

LEE NATIONAL CORPORATION, Defendant.

No. 66 Civ. 1154.

United States District Court, S. D. New York.

Feb. 22, 1971.

Auerbach & Labes, New York City, for plaintiffs; William Auerbach and Stanley W. Taylor, New York City, of counsel.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for defendant; Justin N. Feldman, Peyton H. Moss, Louis B. Livingston, and Paul R. De Rensis, New York City, of counsel.

MANSFIELD, District Judge.

In this suit by an international union (the "Union"), against an employer (the "Company") for alleged breaches of collective bargaining contracts with respect to employees at the Company's former Conshohocken and Youngstown plants, the complaint alleges three claims. The Company has moved for summary judgment as to the last two of these claims, one of which (2nd claim of complaint) seeks either (a) arbitration of the Union's claim to sums allegedly owed by the Company to certain of its

former employees as a special distribution upon the Company's permanent discontinuance of operations at the Conshohocken plant, or (b) judgment for $2 million. The other seeks (a) $2 million in damages for alleged breach of contract arising from the Company's discontinuance of a life insurance plan [1] for its former retired employees, or (b) arbitration of this cause of action. For the reasons stated below, defendant's motion for summary judgment dismissing the second cause of action is granted to the extent that the claim of right to arbitration is dismissed; otherwise it is denied. Defendant's motion is granted as to the third cause of action.

For many years the Company—through its Lee Tire Division—manufactured automobile tires for distribution and sale throughout the country. The tires were made at its Conshohocken plant and sold either through its sales branches through its wholly-owned sales subsidiary (Lee Tires Centers, Inc.), or through retail outlets of the Phillips Petroleum Company, The Pep Boys, and a few other purchasers who sold Lee-built tires under their own labels.

At all relevant times a majority of the Company's production and maintenance employees and test drivers were represented for collective bargaining purposes by Local 227 of the Union pursuant to an agreement between the Company and the Local, hereinafter called the "Working Agreement." All other employees were expressly excluded from the Working Agreement and were not represented by any union. The Working Agreement covered such matters as wages, hours, and working provisions, and it also contained an arbitration and grievance procedure. The last Working Agreement was effective from June 30, 1961 to July, 1963, when it expired.

On April 6, 1950, the Company entered into a separate agreement with Local 227 under which the Company established a non-contributory pension plan for certain of its employees, and an agreement whereby the Company would provide insurance coverage to employees covered by the Working Agreement. Later, in 1959, two further agreements for workers' benefits were reached: effective July 1, 1959, the Company provided a plan for supplemental workmen's compensation benefits for employees covered by the Working Agreement and also a plan for paying a service award and a special distribution on discontinuance of operations to certain of those employees upon the termination of their employment under certain circumstances and conditions. Finally, there was what may be described as a codification: On June 30, 1961, these four agreements were brought together and modified into a single agreement, effective July 1, 1961, which will be called the Welfare Agreement.

During this period the labor-management relations were calm, but it was the calm before a storm. About July, 1962, Maurice M. Clairmont acquired working control of the Company. The Union contends that Clairmont was and is a "Corporate Raider," whose procedure, allegedly followed in this case, is to take a marginally profitable company, liquidate its business operations, and realize a substantial profit over and above the purchase price paid by him for its shares. The Company denies all this.

Whatever Clairmont's intentions, he was faced with the Working Agreement and the Welfare Agreement. The expiration dates of these agreements did not coincide: the Working Agreement was to run from June 30, 1961 to June 30, 1963, and thereafter renew itself for yearly periods unless proper notice of termination was given (Working Agreement § 18.01); and the Welfare Agreement from July 1, 1961 to June 30, 1966.

---

[1]. The Union states that only *life* insurance benefits are the subject of this action, while termination of hospitalization and other insurance benefits has been the subject of another action: United Rubber, Cork, Linoleum and Plastic Workers of America, A.F.L.–C.I.O. Local 102 v. Lee Rubber & Tire Corp., 269 F.Supp. 708 (D.N.J.1967).

However the Welfare Agreement provided that it could be reopened after May 1, 1964, by either party for renegotiation and that failure to agree on new terms within a certain period of time would permit either party to terminate the Welfare Agreement upon stipulated notice, together with the Working Agreement, which would leave the Union free to strike. The Working Agreement also provided that it could be terminated by either party upon stipulated notice if, after reopening, the Welfare Agreement should be terminated.

The Company came upon hard times, with profits low. On April 16, 1963, the first day when notice could be given by either the Company or the Union of a desire to amend the Working Agreement prior to its otherwise automatic renewal for one year on July 1, 1963, top executives of the Company met with officials of the Union and its Local 227. Lengthy negotiations followed. The Company argues that it was trying in good faith to keep on its feet in spite of hard times. The Union argues that the negotiations show that the hard times were *not* attributable to the employees or the beneficial provisions of the Welfare and Working Agreements.

On June 29, 1963, one day before the Working Agreement expiration date the Company informed the Union that the Company would continue to maintain the same wages and working conditions contained in the expiring Working Agreement until formal notice by the Company. The Union responded that its members would work on a day-to-day basis under the provisions of the old contract while negotiations continued. Clairmont, at a bargaining meeting on July 3, 1963, suggested that the Union accept a 25% wage cut and a productivity sharing plan in return for a profit sharing agreement. The Union—perhaps to no one's surprise—refused to go along with the wage cut. However, the Union did offer a one-year extension of all agreements, at the end of which time the Union would agree to accept a wage cut in proportion to any cost increase chargeable to labor only. Clairmont rejected this offer. The Union also suggested that it would take 5% of its wages in Company stock, but this proposal was also rejected. Finally, the Federal Mediator (who was present at this as well as many other bargaining sessions) suggested that both sides submit to either binding or nonbinding arbitration. The Union accepted this proposal but the Company rejected it.

On July 12, 1963, the Union indicated that it would agree to a substantial rollback of the 1961 benefits, vacation pay formula, and contract termination date. The Company reply on July 16, 1963, informed the Union that it would no longer even continue in force the old Working Agreement but instead would put into effect new terms and conditions of employment which were less favorable to the workers—e. g., wage reduction of 20%—and which were designed—says the Company—to put the Company in a more competitive position. On that same day and in response to this new Company position the Union began what became the longest work stoppage (the Company calls it a strike but the Union calls it a lockout) in the history of Pennsylvania.

On May 1, 1964 (during the strike), the Company notified the Union that it wished to open for renegotiation the provisions of the Welfare Agreement, which that agreement permitted; the Company wished to reduce the Union benefits provided by the existing agreement; the Union did not agree and so the Company gave its 60-day notice that it desired to terminate the Welfare Agreement, which was terminated on September 8, 1964.

On September 18, the Company notified its retired employees that the Welfare Agreement was terminated and their insurance coverage under that Agreement would terminate at the end of September, because premiums were only paid until then. The Union immediately objected and on October 2, 1964, the Company announced that it would continue modified insurance coverage

for retired bargaining unit employees and other Company employees. This program the Company labelled as "voluntary," and it was terminated as of June 1, 1965.

Meanwhile on November 30, 1964, the Board of Directors of the Company voted to discontinue all operations at the Conshohocken plant; on December 10 the Company reported this decision to the Union, which stated that it would continue to picket the plant. On December 14, 1964, the Company sent letters to its employees formally announcing that their employment by it was terminated. Picketing continued until a subsidiary of the Goodyear Tire & Rubber Company actually occupied the plant in July of 1965, under a lease from the Company.

On July 14, 1965, the Union notified Local 227 that it was terminating the strike against the Company and discontinuing strike benefits. On November 4, 1965, the Union revoked the Local's charter as of November 30, 1965. The Union now claims that it is the successor to all of the assets, liabilities, right, title, and interest of the Local. United Rubber, Cork, Linoleum and Plastic Workers of America v. Local 227, United Rubber, Cork, Linoleum and Plastic Workers of America, Court of Common Pleas, Penn. (#66–10963) (March 5, 1968), affd. per curiam, 435 Pa. 635, 257 A.2d 263 (1969).

■ Against this background we turn first to the Union's second cause of action, which seeks arbitration of its claim for severance pay (i. e., a special distribution upon the Company's permanent discontinuance of operations at the Conshohocken plant) or, in the alternative, judgment for $2 million. No valid basis is shown for compelling arbitration of the claim. There was no general arbitration clause in the Welfare Agreement. Article II, Section VI, of that Agreement, which dealt with the separate subject matter of the Union's second cause of action—special distributions upon discontinuance of operations—did not provide for arbitration of disputes concerning such special distribu-

tions. Although other separate and separable provisions of the Agreement provided for arbitration of disputes with respect to other matters (e. g., differences as to supplemental workmen's compensation benefits), they have no application to the subject matter of the Union's second cause of action. Accordingly we are powerless to compel arbitration of the issues presented therein. United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U. S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ Nor is there any merit to the Union's argument that the question of arbitrability of the issues has been adjudicated by the Third Circuit Court of Appeals in a suit between the same parties in United Rubber, Cork, Linoleum and Plastic Workers, etc., v. Lee Rubber & Tire Corp., 394 F.2d 362 (3d Cir. 1968), affirming, 269 F.Supp. 708 (D. N.J.1967), and that we are bound by that adjudication on principles of *res judicata*, collateral estoppel, or *stare decisis*. That action did not present the question of arbitrability of claims for severance pay under the Welfare Agreement. It raised issues under other separate articles of that Agreement which, as we have noted, contained procedures that are inapplicable to the issues before us. The decision would not therefore operate to require arbitration of the issues here. Bloch v. Mill Factors Corp., 119 F.2d 536, 538 (2d Cir. 1941).

■ In any event the Union has never notified the Company, prior to the institution of the present action in April 1966, of its desire to submit the severance pay dispute to arbitration. On the contrary, the Union's counsel has more recently expressed the desire to proceed immediately to trial in this court. Thus it would appear that if the Union ever had a right to arbitration that right has since been waived. The Belize, 25 F. Supp. 663 (S.D.N.Y.1938), appeal dismissed, 101 F.2d 1005 (2d Cir. 1939) (per curiam); Krauss Bros. Lumber Co.

v. Louis Bossert & Sons, Inc., 62 F.2d 1004 (2d Cir. 1933).

Turning to the merits of the Union's claim for severance pay, the Company basically argues in support of its motion for summary judgment that under the Welfare Agreement, discussed above, the special distribution was only payable "In the event that all operations at the plant covered by this Agreement shall be completely and permanently discontinued prior to the termination of this Agreement." (Agreement, p. 2). But, says the Company, the Welfare Agreement expired on September 8, 1964 and the Company did not completely and permanently discontinue its operations at the Conshohocken plant until November 30, 1964. Since the Company did not discontinue operations until *after* termination of the Welfare Agreement, it contends that no severance pay is due under the latter agreement.

The Union answers that Clairmont wanted to sell the assets of the plant, because the plant was worth more under his liquidation program, *provided* the Company could avoid substantial obligations to the Union for severance pay and the maintenance of certain insurance benefits pursuant to the terms of the Welfare Agreement. The essential theory of the Union's case is that the Company perpetrated a fraud upon its Local by unilaterally imposing conditions which provoked and forced a strike, thus making it appear that the Company was shut down by unreasonable Union members striking over simple economic issues. Then, during the course of this forced strike, the Company's plan was to terminate the Welfare Agreement two years before its ordinary termination date, pursuant to procedures providing for such early termination. The Company is liable, says the Union, because it in reality shut down the plant on the day it forced the Union to strike, or at least sometime before September 8, 1964, the date when the Welfare Agreement was terminated.

Thus the Union must prove that the discontinuance of plant operations by the Company actually occurred at or about the time when the strike commenced, which was on July 16, 1963, rather than on November 30, 1964, when the Company's Board voted to discontinue operations. Upon the record before us the Union appears to have almost no chance at all of sustaining this heavy burden. Quite aside from testimony of Company officials as to their intentions, there is overwhelming evidence that the Company, after the strike began and even after the Welfare Agreement was terminated, was struggling to resume operations. For instance, it continued after September 8, 1964 to maintain at the Conshohocken plant a large staff (some 55 persons) of executive, administrative, sales and technical personnel. Salesmen continued to promote and sell Lee tires, to conduct sales training programs, and to service Lee tire sales branches. There was no attempt to dispose of the plant or any of its tire-making equipment. On the contrary, maintenance personnel continued to keep the plant and machinery in condition for resumption of tire manufacture as soon as the strike should end. Laboratory personnel continued to redesign molds for development of new tire styles for future production. During the entire period existing customers were supplied by arrangements with Mohawk Rubber Company and United States Rubber Company to manufacture Lee tires from Lee molds.

The Union's claim furthermore appears to us to be but a belated rationalization, which is inconsistent with its own earlier position. In January 1965, for instance, the Union contended that the discontinuance of operations had occurred on December 14, 1964. Its original complaint, filed on April 25, 1966, alleged that the Company had ceased operations on or about July 1, 1965. A complaint filed by it in the Pennsylvania Court of Common Pleas alleged that it discontinued in January 1965. It was not until September 1967, after the weakness of its position became apparent, that the Union took its present

stance to the effect that the July 1963 strike constituted a "lock-out" and a "complete and permanent discontinuance of all operations at the plant within the meaning of Article II, Section VII, Special Distributions on Discontinuance of Operations".

Notwithstanding the apparent flimsiness of plaintiff's claim, we are precluded, under the interpretation of Rule 56 which governs in this Circuit, from dismissing the second cause of action as a matter of law. Despite the weakness of the claim, it does present an issue as to the intent of the Company, i. e., whether the management purposely provoked or forced the Union into striking on July 16, 1963, with the intent of permanently closing down operations and never thereafter reopening. If the record before us at trial were the same as that before us on this motion, judgment would be entered in favor of the Company. At this stage, however, since a material issue has been presented as to the management's intent, we cannot act summarily and we must permit the case to go to trial. Dolgow v. Anderson, 438 F.2d 825 (2d Cir. 1970); Kletschtka v. Driver, 411 F.2d 436 (2d Cir. 1969); United States v. Farr & Co., 342 F.2d 383, 385 (2d Cir. 1965); Xerox Corp. v. Dennison Manufacturing Co., 322 F.Supp. 963 (S.D.N.Y.1971); Byrnes v. Mutual Life Insurance Co., 217 F.2d 497 (9th Cir.), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955). See also, Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945) (Frank, J.). Plaintiff's papers show that it has enough evidence to preclude our holding that plaintiff could not possibly prove its case.

Turning to the third cause of action which claims that the Company's May 1965 discontinuance of "Voluntary Group Life and Health Coverage theretofore maintained for retired employees" (Amended Compl. ¶ 6 of Third Cause of Action) breached the Welfare Agreement, certain additional facts are undisputed. The Welfare Agreement's "In-surance Program" expressly obligated the Company to provide certain group insurance benefits for "Employees" which in the case of any active employee would terminate upon termination of that employee's employment with the Company. The Agreement further provided that retired employees would receive certain group health benefits and that the group life insurance of retired employees would be "continued" in the amount of $2,250. Article III of the Agreement expressly provided that "The Company shall be relieved of any liability to any Employee * * * *other than to maintain such [insurance] contract or contracts in force for the duration of this Agreement.*" (Emphasis added)

On September 8, 1964, as we have already noted, the Welfare Agreement was terminated. On September 18, 1964, the Company informed its retired employees that although the termination ended the Company's obligation to provide group insurance under the Agreement upon expiration of the current month, it was going to put into effect "on a voluntary basis" certain modified or lesser group insurance "in the hope that a final solution will be found to the pending issues between the Company and the Union," which had led up to the termination. The letter further stated that the Company's voluntary provision of group insurance for retirees was "without any prejudice and without any waiver at all of our rights to discontinue such coverage at any time" and was not to be "construed to create any contractual relationship between the Company and any retired employee" and did not affect "the termination of the Welfare Agreement, of all provisions thereof and of all the Company's former obligations thereunder."

The reduced insurance for retirees was then voluntarily provided by the Company up until May 12, 1965, when the Company terminated the insurance by letter to retired employees because the Company's insurance carrier refused

to continue to cover exclusively for such an elderly group, the insurance of active employees having ended with the termination of the Welfare Agreement in September 1964. The Union and retired employees accepted the reduced insurance thus voluntarily provided by the Company and did not make any claim of right thereto or to any insurance under the Welfare Agreement.

■ Upon this record we have no hesitancy in saying that the Union's demand for arbitration of the third claim should be dismissed as a matter of law. The Welfare Agreement had been effectively terminated pursuant to its terms a year and a half before the present action was commenced. No grievance or demand was ever made for arbitration of retired employees' insurance rights.[2] Thus, even assuming arbitration was available to the Union as a matter of right, the Union deliberately by-passed any arbitration route in order to seek damages here. On such a record arbitration must be denied as a matter of law. See *The Belize, supra.*

■■ Upon the undisputed facts we also find that summary judgment should be granted dismissing the third cause of action as a matter of law. Even if we were to assume that the term "continued," as used in Section II, ¶ C, of the Welfare Agreement's "Insurance Program" in reference to retired employees is ambiguous, the Union does not propose to offer any evidence to the effect that the term was intended to continue group life insurance in effect after the termination of the Welfare Agreement. Plaintiff's single assertion that the Company is liable to maintain the life insurance coverage for all retired employees beyond the life of the Welfare Agreement (see Hess Aff. ¶ 48) is completely unsupported. Nowhere does plaintiff allege that it could produce parol evidence which might support its unusual reading of the contract. Plaintiff may not simply rest upon the mere denial of defendant's position. Rule 56(e), F.R.Civ.P. Since under these circumstances the construction of the Agreement presents a question of law for the court to decide, e. g., 3 Corbin on Contracts § 535 at 19–20, *et seq.,* it seems clear to us that Article III of the Welfare Agreement provided that insurance coverage of active employees would end immediately upon termination of their employment, whereas the coverage for retired employees would be continued in effect for the duration of the Welfare Agreement, which expressly provided that the Company would only be obligated to maintain insurance contracts "in force for the duration of this Agreement." The Union does not dispute the fact that the termination of the Welfare Agreement terminated the insurance rights of active employees. The intent to terminate as to *all* employees, including retirees, is fortified by the undisputed fact that group insurance, which rests upon the insurability of the *entire* group, would be unobtainable, except possibly at prohibitive rates, for a group limited to retirees, who are for the most part over 65 years of age.

For the foregoing reasons defendant's motion for summary judgment dismissing the second cause of action of the complaint is granted to the extent that plaintiffs' claim of right to arbitration is dismissed. Otherwise the motion is denied as to the second cause of action. Defendant's motion for summary judgment dismissing the third cause of action is granted.

It is so ordered.

---

2. Grievance No. 209 dealt solely with insurance benefits of striking employees and not with benefits of retirees.