ing the Beloit-HOVIC contract be, and the same is hereby, GRANTED;

IT IS FURTHER ORDERED that the motion of Hess Oil Virgin Islands Corporation for summary judgment on the issue of contribution be, and the same is hereby, DENIED;

IT IS FURTHER ORDERED that the motion of Beloit Power Systems, Inc., for summary judgment on the issue of indemnity be, and the same is hereby, DENIED;

IT IS FURTHER ORDERED that the motion of Hess Oil Virgin Islands Corporation for summary judgment on the issue of indemnity in the HOVIC-Litwin contract be, and the same is hereby, GRANTED;

IT IS FURTHER ORDERED that the motion of Litwin Corporation for summary judgment be, and the same is hereby, DENIED.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), and its Locals 704 and 1215, Plaintiffs,

v.

ROBLIN INDUSTRIES, INC., Defendant.

No. K82–205 CA9.

United States District Court, W.D. Michigan, S.D.

March 31, 1983.

A. Robert Kleiner, Grand Rapids, Mich., M. Jay Whitman, Detroit, Mich., for plaintiffs.

Varnum, Riddering, Wierengo & Christenson by Charles S. Mishkind, Grand Rapids, Mich., Jaeckle, Fleischmann, & Mugel by Randall Odza and Brian J. Troy, Buffalo, N.Y., for defendant.

## OPINION

HILLMAN, District Judge.

This civil action was brought by the International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) and its affiliated Locals 704 and 1215 for alleged breaches of a Collective Bargaining Agreement by defendant Roblin Industries, Inc. Jurisdiction is predicated upon section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a).

As originally pleaded, the instant complaint contained two counts and was filed against Roblin Industries, United Steel and Wire and Donald Carstens. On October 15, 1982, this court dismissed Count I of the complaint. Since that date, plaintiffs have been permitted to amend their complaint adding two additional counts against Roblin Industries. These additional counts have been bifurcated pursuant to Rule 42(b) of the Federal Rules of Civil Procedure.

Currently before the court are the liability issues in Count II of plaintiffs' complaint. The primary issue raised by Count II of plaintiffs' complaint concerns the interpretation of the last Collective Bargaining Agreement between the UAW and defendant Roblin. More specifically, the court must determine whether retired employees of Roblin are entitled to receive lifetime health and life insurance benefits provided under Collective Bargaining Agreements despite the cessation of defendant's operation of its Battle Creek, Michigan, manufacturing facility.[1]

---

1. In an opinion dated December 9, 1982, this court granted defendant's motion for partial summary judgment with respect to employees who were not "retirees" on the date of defendant's termination of its Battle Creek facility. The parties have informed the court that there is some disagreement as to the retired status of some workers. A precise resolution of this matter will await further briefing by the parties.

The liability issues of Count II of the complaint were heard by this court in a non-jury trial held on December 14–15, 1982, and on January 10, 1983. The court heard testimony from 13 witnesses and received 53 exhibits. The parties have filed comprehensive post-trial memoranda, and I now make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Roblin Industries is a New York corporation headquartered in Buffalo, New York. From 1968 through July 2, 1982, Roblin operated United Steel and Wire Division (United Steel), a manufacturing plant in Battle Creek, Michigan, which Roblin had purchased from Harold J. Ruttenberg and other shareholders in 1968.

For all periods of time relevant to the instant action, the UAW and its Locals 704 and 1215 were the exclusive bargaining representatives of certain hourly employees at Roblin's Battle Creek facility. Local 704 represented the plant and maintenance employees while Local 1215 represented office workers.

On June 2, 1981, Roblin and the UAW locals entered into Collective Bargaining Agreements which were to remain in effect until September 30, 1984. The Agreements between the parties contain similar provisions providing life and health insurance for active and retired workers. They also contain similar provisions with respect to the duration of the agreements. Although the dates contained in Article XII § 2 of the 1981 Local 1215 Agreement differ from those in Supplement M § 2 of the 1981 Local 704 Agreement, testimony from the parties establishes that the differing dates resulted from clerical error. The parties agree that identical consequences follow, with respect to Count II, under either Agreement.

The provisions which plaintiffs contend create retiree health and life insurance benefits that survive beyond the term of the Agreements or plant closure are contained in Article XII of the 1981 Local 1215 Collective Bargaining Agreement and Supplement M of the 1981 Local 704 Agreement. Article XII of the Local 1215 Agreement provides as follows:

### "ARTICLE XII

### INSURANCE PLANS

1.

The eligibility requirement of the various coverages described in this Article is the completion of an employee's probation period.

2.

The provision of the fully Company paid Hospital-Medical-Surgical, Major Medical, Weekly Indemnity, Life Insurance, Transition and Bridge and Medicare Supplement Benefit plans prevailing at the Bargaining Agreement expiration date of September 30, 1981 shall continue through December 1, 1984.

3.

Commencing with December 1, 1977, the modifications as outlined hereinafter in this Article XII shall become effective and continue for the duration of the 1981–1984 Agreement:

(a) Blue Cross and Blue Shield shall become the carrier for hospitalization medical, prescription drug ($2.00 co-paid basis), emergency medical, ambulance, V.S.T., major medical ($100.00 individual deductible and $200.00 family).

(b) A new vision care program shall become effective the second year of the contract (October 1, 1978) and shall include retirees.

(c) The new Sickness and Accident Benefit with a maximum disability period of 52 weeks provides as follows:
November 1, 1979 becomes $130.00 per week
January 1, 1982 becomes $140.00 per week

(d) The new Hospital-Medical-Surgical and Medicare coverages under the base place for health care will continue to

apply to retired employees with the Company assuming the full cost thereof.

The same coverages, less the Medicare Supplement, will be available to spouses of deceased retirees at group rate cost (it is to be understood that the spouse will pay the monthly cost at group rate if such spouse chooses to continue these coverages).

(e) As in the past, the Major Medical coverage shall not apply to retired individuals or spouses of same.

(f) The Transition and Bridge Benefit continues at $150.00 monthly at age 45 as provided.

(g) Life Insurance Coverage: Life Insurance coverage for active employees shall be $8,000.00. This coverage shall include the Accidental Death and Dismemberment provision (of the $8,000 coverage, $6,000 shall be with the Total and Permanent Disability provision and the remaining $2,000 will be with the Premium Waiver provision with the latter figure being payable only upon the death of the insured).

(h) The levels of post retirement coverage for those having retired or for future retirees under the Group Pension Plan shall continue to be as in the past and as outlined.

1. Twenty-five years of credited service or more at retirement;

| | |
|---|---|
| First year of retirement | $6,000.00 |
| Second year of retirement | $3,600.00 |
| Third year of retirement and for life | $2,400.00 |

2. At least ten years but less than twenty-five years credited service at retirement;

| | |
|---|---|
| First year of retirement | $3,600.00 |
| Second year of retirement | $2,400.00 |
| Third year of retirement and for life | $1,600.00 |

3. Less than 10 years of credit service; None."

The benefits provided under the Agreements were not funded by a trust arrangement. Rather, Roblin paid monthly insurance premiums to its carrier to secure continued insurance coverage for Roblin employees and retirees. Additionally, the insurance coverage provided under the Collective Bargaining Agreements was unitary coverage. That is, both active and retired workers were included in the same insurance group for purposes of establishing Roblin's insurance premium.

The labor contracts which provide insurance benefits contain provisions which, defendant contends, specifically limit the duration of retiree insurance coverage to the term of the Agreements or the cessation of plant operations. Defendant first points to paragraph 3 of Article XII of the 1981 Local 1215 Collective Bargaining Agreement to support its position. That paragraph reads as follows:

"3.

Commencing with December 1, 1977, the modifications as outlined hereinafter in this Article XII shall become effective and continue for the duration of the 1981–1984 Agreement."

In addition, defendant points to the general duration provisions contained in Article XVIII of the 1981 Local 1215 Collective Bargaining Agreement and Article XII of the 1981 Local 704 Collective Bargaining Agreement as establishing the limited nature of retiree coverage. Article XVIII of the Local 1215 Agreement states as follows:

## "ARTICLE XVIII

### Duration of Agreement

"This agreement, in conjunction with the supplementary agreements, constitutes the full and complete agreement between the parties except as subsequently modified by them in writing signed by both parties and will extend from the second day of June, 1981 through the last day of September, 1984, and from year to year thereafter until terminated or amended by either party by giving the other sixty (60) days' written notice of its desire to terminate or amend the same at the expiration of any yearly period. Neither party to this agreement may reopen negotiations for changes in wage rates during the life of this agreement, (excepting in change of job content as provided for in the agreement and except as provided for

in the following paragraph) and they will not be the issue of any Strike, Walkout or Lockout.

The parties further agree that the schedule of wages and fringe benefits (Specifically wages, cost-of-living, pensions and sick and accident) shall become a negotiable matter effective September 30, 1982, by the Union or Management serving sixty (60) days notice to the other party prior to September 30, 1982, of their desire to negotiate on wages and the above fringe benefits."

The UAW has opposed defendant's argument on two grounds. First, the UAW contends that the duration language contained in paragraph 3 of Article XII of the Local 1215 Agreement only applies to "modifications" of existing health plans rather than limiting all insurance benefits. Accordingly, the UAW contends, paragraph 3 of Article XII did not limit retiree insurance coverage to the term of the labor agreements. The UAW contends that this "modification" language leaves intact insurance coverage bargained for in earlier agreements.

With respect to the general durational provision contained in the 1981 Local 1215 Collective Bargaining Agreement, the UAW has asserted a two-fold argument. First, the UAW contends that the general durational language contained in Article XVIII is restricted by the specific insurance provisions granting the alleged lifetime insurance benefits. Second, the UAW alleges that any durational language in Article XVIII cannot be given effect because lifetime benefits for retirees were granted in earlier agreements and carried forward into the 1981 Agreements. The UAW asserts that since lifetime benefits were granted in earlier agreements, any attempt by the parties to limit those benefits would be contrary to established legal precedent and violative of federal labor policy. *Citing Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

To support the claim that lifetime benefits were granted before the 1981 Agree-

ments, the UAW points to a 1965 Insurance Agreement between the UAW Locals and the United Steel and Wire Co. That Agreement provides, in pertinent part:

## "INSURANCE AGREEMENT

On this 15th day of January, 1965, the United Steel & Wire Company and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (U.A.W.), affiliated with the A.F.L.–C.I.O., and its affiliated Locals 704 and 1215, on behalf of the employees covered by the collective bargaining agreements between the parties agree that:

Effective February 1, 1965 the coverages outlined in Parts I, II, & III hereof will be provided subject to the terms and limitations set forth herein for the duration of the collective bargaining agreements of which this Insurance Agreement is a part.

## PART I

GROUP HOSPITAL–SURGICAL MEDICAL INSURANCE—WEEKLY INDEMNITY INSURANCE FOR SICKNESS AND ACCIDENT.

SECTION 1. HOSPITAL–SURGICAL–MEDICAL INSURANCE APPLICABLE TO ACTIVELY EMPLOYED PERSONNEL.

The Schedule of Benefits and scope of services are those provided by the Michigan Hospital Association (Blue Cross-Blue Shield) M–75 Plan and are defined in your individual certificates and handbooks distributed by the underwriter.

\*   \*   \*   \*   \*   \*

SECTION 4. TERMINATION OF HOSPITAL–SURGICAL–MEDICAL INSURANCE.

(a) With Respect to Employees:

The insurance terminates upon:

(i) Termination of Active employment for any reason other than retirement under the pension plan or layoff. (Coverage for retired employees provided

under Section 7 hereof). (Coverage applicable to laidoff individuals provided under Section 8 hereof).

(ii) Failure of the employee to contribute any required premium.

(b) With Respect to Dependents:

(i) The coverage on all your dependents ceases upon the termination of your insurance, and for those reasons pertaining to age or marriage as provided in your certificate.

SECTION 7. HOSPITAL–SURGICAL–MEDICAL INSURANCE APPLICABLE TO RETIRED INDIVIDUALS.

(a) Individuals who retire under the terms of the Group Hourly Pension Plan shall be provided on a cost free basis the same M–75 Plan coverage as applicable to active employees and such coverage will also apply to dependents as defined.

(b) Coverage for the retired individual and his dependents shall terminate upon death of the retired individual."

The UAW presented a substantial amount of testimony regarding the parties' intent in entering into the 1965 Insurance Agreement. Mr. Kenneth Johnson, President of Local 704 from 1965 to 1973, testified that prior to 1965 there were no lifetime insurance benefits for retirees. Although he did not participate in negotiating the insurance provisions which were incorporated into the 1965 labor agreements, Mr. Johnson testified that the 1965 Agreements represented a major achievement for union membership in that United Steel & Wire, for the first time, assumed the full cost of retiree insurance premiums and provided United Steel & Wire workers with early retirement benefits. Additionally, Mr. Johnson stated that his understanding was that the 1965 Insurance Agreement provided for lifetime retiree insurance benefits.

In opposing the UAW's assertions, defendant Roblin introduced defendant's Exhibit II, a document entitled "Economic Proposal and Settlement Agreement between United Steel & Wire Company and Locals 704 and 1215." This document, dated January 11, 1965, was prepared by the Locals and submitted to the union membership as part of the ratification process. Although outlining the various benefits contained in the 1965 Agreements, this document does not list lifetime insurance benefits as part of benefits obtained in the 1965 agreements.

To substantiate defendants' contention that no labor agreement ever granted lifetime insurance benefits, Roblin called Mr. Harold J. Ruttenberg to testify. Mr. Ruttenberg purchased United Steel in April of 1964 and acted as United Steel's Chairman and President until United Steel was sold to Roblin in 1968. At the time of the purchase, the company was in the process of being sold to liquidators.

Mr. Ruttenberg has an extensive history of involvement in the labor movement in the United States. He was one of the original organizers of the United Steelworkers and has published widely in the field of labor-management relations.

Upon purchasing United Steel, Mr. Ruttenberg attempted to implement his theories of cooperative industrial management. Stated simply, Ruttenberg's "production value sharing plan" (PV plan), provided that all money available for expenditures, capital investments, wages, benefits, and profits was to be limited to the difference between the cost of producing a finished product and the amount received from a customer for the finished product. Under Ruttenberg's theory, a unionized plant with high labor costs could, ostensibly, compete with a non-unionized plant with lower employment costs if management adopted principles of "humanation" and unions adopted the objective of increasing productivity. If implemented, the PV plan, according to Ruttenberg, would result in a secure well-paid work force. On a national scale, Ruttenberg envisioned his PV plan as ending poverty in the United States by providing what was characterized at trial as "The Three E's"; that is, Everything, for Everyone, Everywhere.

Mr. Ruttenberg participated in contract negotiations at United Steel & Wire from 1964–1968. He testified that during those

years, Locals 704 and 1215 never proposed or discussed lifetime insurance benefits. Mr. Ruttenberg credibly testified that although United Steel granted early retirement benefits and fully paid insurance, lifetime guarantees of insurance benefits were fundamentally contrary to his theories of industrial management.

Defendant introduced numerous communications written from 1965–1967 by Ruttenberg to United Steel employees. These communications generally extoll the virtues of Ruttenberg's PV Plant and continuously encourage United Steel employees to increase their productivity. Ruttenberg's memos to employees often informed United Steel workers of the increased benefits they had obtained since Ruttenberg purchased the company in 1964.

Communications written in 1966 show that relations between labor and management at United Steel were strained at best. Ruttenberg's letters to employees during this period show that Ruttenberg overestimated the capacity of United Steel & Wire Co. to fund the employee benefits granted in 1965. Ruttenberg attempted, on numerous occasions, to impress upon United Steel employees the importance of increased productivity and profitability of United Steel. On at least two occasions, Ruttenberg informed United Steel employees that productivity needed to be increased because without increased productivity, United Steel pensions, "were worth nothing, except as they are supported by cash reserves deposited with the insurance company or the continuing operations and profitability of your job providing employer." (Letter of December 5, 1966.)

Ruttenberg's testimony showed that relations with the Union Locals continued to deteriorate until United Steel & Wire was purchased by Roblin in 1968. Notwithstanding that the sale of United Steel was precipitated, at least in part, by poor management-labor relations, and that Mr. Ruttenberg continues to express hostility toward the instant Locals, I find his testimony, at least with respect to his intent in entering into labor agreements during his tenure, to be credible. Ruttenberg's testimony, which evidenced his single-minded, almost fanatic, devotion to production value concepts in conjunction with contemporaneous written documents, satisfies this court that Mr. Ruttenberg did not intend to commit United Steel & Wire to financing lifetime insurance benefits during his tenure.

As a rebuttal witness, plaintiffs called Danny Dilsaver, who was Local 704's recording secretary from 1955 through 1972. Mr. Dilsaver testified that Ruttenberg's plan to increase productivity at United Steel was hindered by the high average age of the United Steel workforce. To overcome this threat, Ruttenberg, according to Mr. Dilsaver, offered early retirement pensions, company paid insurance premiums and lifetime insurance benefits.

Although I find Dilsaver's testimony credible with respect to United Steel's wish to obtain the early retirement of older United Steel workers, I am unable to credit Mr. Dilsaver's testimony regarding the grant of lifetime insurance benefits. Plaintiffs introduced, through Mr. Dilsaver, Local 704's notes from the 1964–1965 contract negotiations. These notes contain minutes from bargaining sessions as well as notes from internal union meetings. Although these notes mention early retirement benefits and fully paid insurance benefits, nothing in these documents indicates that lifetime benefits for retirees were proposed or considered. In light of the great importance attached to achieving lifetime benefits by plaintiffs' witnesses, I find that the absence of any mention of lifetime guarantee supports defendant's witnesses.

Plaintiffs also called as a witness Mr. James Warner, a UAW International Representative. Since 1972, Mr. Warner has negotiated labor agreements and handled grievances on behalf of United Steel employees. Mr. Warner's testimony, in large part, consisted of explaining the Locals' view as to how labor agreements incorporate benefits granted in earlier agreements. Mr. Warner testified that benefits granted in a collective bargaining agreement are automatically "folded in" or carried for-

ward into successive labor agreements. In Mr. Warner's view, any benefits granted in an agreement are "vested" and not renegotiated at the expiration of a given agreement. Rather, only new benefits or "modifications" are negotiated.

By way of illustration, Mr. Warner pointed to the 1977 Local 1215 Agreement. That Agreement provides in pertinent part:

## "ARTICLE XII

### INSURANCE PLANS

1.

The eligibility requirement for the various coverages described in this Article is the completion of an employee's probation period.

2.

The provision of the fully Company paid Hospital-Medical-Surgical, Major Medical, Weekly Indemnity, Life Insurance, Transition and Bridge and Medicare Supplement Benefit Plans prevailing at the Bargaining Agreement expiration date of September 30, 1977 shall continue through December 1, 1977.

3.

Commencing with December 1, 1977, the modifications as outlined hereinafter in this Article XII shall become effective and continue for the duration of the 1977–1980 Agreement:"

In Mr. Warner's view, only the "modifications" listed in paragraph 3 were the subject of negotiations in 1977. Mr. Warner stated that any benefits or "modifications" in earlier agreements were automatically carried forward into the 1977 Agreements. Likewise, Mr. Warner testified that those modifications listed in paragraph 3 of the 1977 Agreement were automatically carried forward and became vested lifetime benefits at the expiration of the 1977 Agreement.

On cross-examination, Mr. Warner was questioned with regard to Supplement M, paragraph 2 of the 1974 Local 704 Agreement. This paragraph, which is included in all recent Agreements between the parties, provides:

## "SUPPLEMENT M

Insurance:

1. The eligibility requirement for the various coverages described in this Supplement is the completion of an employee's probation period.

2. The provision of the fully Company paid Hospital-Medical-Surgical, Major Medical, Weekly Indemnity, Life Insurance, Transition and Bridge and Medicare Supplement Benefit Plans prevailing at the Bargaining Agreement expiration date of September 30, 1974 shall continue through October 31, 1974."

Mr. Warner testified that this paragraph was placed in the Agreement to insure that benefits prevailing at the expiration of the Agreement were continued during bargaining negotiations. Mr. Warner conceded that as of October 31, 1974, all benefits covered by paragraph 2 were exhausted. In later testimony, Mr. Warner testified that benefits listed in paragraph 2 extended beyond October 31, 1974. I find Warner's later testimony of questionable credibility in light of the explicit language contained in paragraph 2.

Warner's testimony with respect to the UAW's vesting theory is further eroded by plaintiffs' Exhibit 13. That document, which is a Roblin's 1974 economic proposal, specifically stated that the implementation of benefits already agreed upon by the parties would be contingent upon reaching agreement on unresolved issues. Those benefits listed as being agreed upon include both the base insurance plan and modifications of the plan. Mr. Warner testified that had no agreement been reached on unresolved issues, there would have been no agreement on the items listed in plaintiffs' Exhibit 13.

Mr. Warner also testified that in the fall of 1973, Mr. Warner conferred with Jack Nusbaum who was United Steel's Vice President of Operations. Mr. Warner stated that after the company had unilaterally changed insurance carriers, Mr. Warner

confronted Jack Nusbaum about retiree insurance benefits. Mr. Nusbaum, who died in 1977, allegedly assured Mr. Warner that the new carrier would continue to provide retirees benefits at their current level. Additionally, Mr. Nusbaum allegedly assured Mr. Warner that insurance benefits were lifetime benefits.

I find Mr. Warner's testimony regarding the Nusbaum conversation to have little credibility. First of all, it was allegedly made more than ten years ago. The man who it was claimed made the statement died approximately six years ago, so is unavailable to admit or deny the statement. In addition, although there was some testimony from Union officials regarding other promises that retirees had lifetime benefits, not one witness was able to identify any company official who ever made any such promise or any retiree who had received any such assurance. No retiree was produced in court to testify that during the course of the agreements lifetime benefits were promised by the company or by the Locals themselves. Additionally, none of the insurance certificates or insurance handbooks which listed employee benefits indicated that retiree benefits were lifelong. In the absence of such corroborating evidence, I attach little weight to Warner's testimony regarding the alleged Nusbaum conversation; particularly since such promises would directly contradict the company's position regarding retiree benefits as evidenced in plaintiffs' Exhibit 13; a document authored by Nusbaum.

In support of its position, defendant Roblin produced former United Steel executives who participated in the subject contract negotiations and who testified that benefits contained in previous agreements were subject to negotiation at the expiration of any labor agreement. Despite the fact that these former United Steel executives may have been somewhat biased, I credit their testimony to the extent that during their tenure, the issue of lifetime insurance benefits for retirees was never raised.

Both sides to the instant dispute presented expert testimony in support of their respective positions. Mr. Patrick Killen, a Senior Health Consultant for the UAW, testified on plaintiffs' behalf. Although Mr. Killen did not participate in any negotiations involved in the present dispute, Mr. Killen has been involved in numerous other contract negotiations. Mr. Killen testified that he viewed each of the contracts in issue to carry forward the benefits contained in prior agreements. Additionally, Mr. Killen testified that in his view a majority of UAW agreements contain lifetime insurance guarantees.

Defendant offered the expert testimony of Donald Grubbs, a consulting actuary. Mr. Grubbs has served as a consultant to numerous congressional and administrative committees in the area of pension and welfare funds. Although Mr. Grubbs offered his interpretation of the instant agreements, I find Mr. Grubbs' testimony on these matters to be entitled to no weight. However, Mr. Grubbs credibly testified that insurance companies are not willing to prefund health insurance for retirees because the costs involved are too unpredictable. Additionally, Mr. Grubbs testified, and it was conceded by plaintiffs' expert, that an insurance company would rarely underwrite an insurance group made up entirely of retirees.

Plaintiffs offered into evidence their calculations as to the present value of retiree insurance benefits. To substantiate their claims, plaintiffs offered the testimony of Charles F. Monroe, a consulting actuary. Mr. Monroe testified that although the UAW's figure of over $9,000,000 may have been overstated, the basic cost assumptions used in arriving at this figure were correct.

In January of 1981, United Steel proposed to the instant Locals that insurance coverage be switched to a self-funded basis. The parties held several meetings to discuss insurance costs and employee conversion rights in the event United Steel ceased operations. Although both parties presented testimony regarding the substance of these meetings, no testimony clearly established the particulars of these meetings or whether the parties expressed their respective

views regarding the issue of lifetime benefits.

Early in 1982, the Locals had received information that United Steel might terminate its Battle Creek operations. With this in mind, James Warner wrote to the UAW's Social Security Department to obtain the UAW's position on what benefits would continue beyond the cessation of plant operations. In response to Mr. Warner's inquiry, the UAW responded that some question existed as to whether retirees were entitled to continued insurance coverage. The UAW suggested that the Locals negotiate a plant closing agreement which provided insurance coverage for United Steel employees. No such agreement was ever reached. In July of 1982, defendant Roblin terminated its Battle Creek operations and the instant action ensued.

## CONCLUSIONS OF LAW

█ Plaintiffs are unions with the meaning of section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a). Defendant Roblin is an employer within the meaning of section 301(a). Since the instant action is a suit for alleged violations of Collective Bargaining Agreements between the parties, and since the subject Agreements lack common provisions requiring final and binding arbitration, the court has jurisdiction over the instant controversy.

█ In a suit brought under section 301(a) of the LMRA, the plaintiff bears the burden of proving, by a preponderance of credible evidence, that the defendant has breached the subject agreements. *General Warehousemen's Union Local 852 v. Reliance Electric Co.,* 386 F.Supp. 1303 (S.D.N.Y.1973). In the present case, the UAW and its Locals 704 and 1215 bear this burden of proof.

Plaintiffs contend that those employees who satisfied the retirement eligibility requirements of the Collective Bargaining Agreement for life and health insurance benefits are entitled to those benefits for life. Plaintiffs contend that retirement benefits awarded to a worker upon his retirement are "vested" and are unaffected by the termination of a business. Plaintiffs maintain that the instant Collective Bargaining Agreements contain express language providing lifetime health and life insurance coverage for retirees beyond the cessation of Roblin's Battle Creek facility and that such language should be given effect as a matter of contract interpretation. On the other hand, defendant Roblin contends that the Collective Bargaining Agreement does not provide any lifetime benefits and that the instant Agreement limits any benefits to the duration of the Collective Bargaining Agreement or to the date of the Battle Creek facility's closing.

Plaintiffs place principal reliance for their contention on the language contained in subparagraphs (d) and (h) of paragraph 3 of Article XII of the 1981 Local 1215 Agreement. Plaintiffs contend that the words "will continue" in subparagraph (3) and the words "and for life" in subparagraph (h) create benefits upon retirement which do not extinguish by termination of the Collective Bargaining Agreement or the cessation of plant operations. Plaintiffs allege that since a retired worker has completed his service to the company, retirement benefits are necessarily deferred payment for services already rendered. As such, plaintiffs contend, those benefits are "vested" and are not subject to divestiture for reasons beyond the control of the recipient.

Plaintiffs' vested rights theory stems from the Supreme Court's decision in *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). By way of a footnote, the Court stated:

> "This does not mean that when a union bargains for retirees—which nothing in the opinion precludes if the employer agrees—the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent . . ."

*Id.* at 181, n. 20, 92 S.Ct. at 398, n. 20.

Plaintiffs assert that this footnote in *Pittsburgh Plate Glass* supports their posi-

tion that the benefits granted to Roblin retirees cannot be extinguished by the termination of Roblin's Battle Creek operation.

■ Generally, a collective bargaining agreement does not create an employer-employee relationship and does not guarantee the continuance of any relationship. *Fraser v. Magic Chef-Food Giant Markets, Inc.,* 324 F.2d 853 (6th Cir.1963). Consequently, the rights conferred under a collective bargaining agreement do not normally survive the discontinuance of a business or the expiration of a bargaining agreement. *Id.* at 856. However, rights conferred by collective bargaining can extend beyond the term of an agreement, or beyond the termination of operations, if the parties to an agreement so provide. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *United Rubber, Cork Linoleum and Plastic Workers of America v. Great American Industries,* 479 F.Supp. 216 (S.D.N.Y.1979). Thus, if any benefits are to extend beyond the termination of plant operations, the agreement must so provide. *Oddie v. Ross Gear & Tool Co.,* 305 F.2d 143 (6th Cir.), *cert. denied,* 371 U.S. 941, 83 S.Ct. 318, 9 L.Ed.2d 275 (1962); *UAW v. Robertshaw Controls Co.,* 405 F.2d 29 (2d Cir.1968). Accordingly, the validity of plaintiffs' vested rights theory in the present case, turns on an interpretation of the instant Collective Bargaining Agreement. *See Turner v. Teamsters Local 302,* 604 F.2d 1219 (9th Cir.1979).

■ As a preliminary matter, I note that general principles of contract interpretation are instructive in the instant case. This court must interpret contractual provisions as a whole rather than in isolation from each other. *Florida Canada Corp. v. Union Carbide & Carbon Corp.,* 280 F.2d 193 (6th Cir.), *cert. denied,* 364 U.S. 902, 81 S.Ct. 234, 5 L.Ed.2d 194 (1960). Furthermore, contractual provisions must be reasonably construed so as to make none nugatory and the promises contained therein illusory. *Cordovan Assoc. Inc. v. Dayton Rubber Co.,* 290 F.2d 858 (6th Cir.1961).

In the present case, the 1981 Collective Bargaining Agreement provides that medi-cal coverage under the base plan "will continue" to apply to retired workers. The Agreement also sets forth levels of post-retirement life insurance benefits at a declining rate for the first three years of retirement. Thereafter, life insurance coverage remains constant "for life."

Plaintiffs contend that these provisions explicitly provide for extending benefits beyond the terms of the Agreement or cessation of plant operations. In support of their position, plaintiffs rely on the Sixth Circuit's decision in *Upholsterer's International Union v. American Pad & Textile Co.,* 372 F.2d 427 (6th Cir.1967). In that case, plaintiff sued defendant when, after moving its business, the defendant refused to pay retiree insurance premiums. With respect to life insurance benefits, the Court of Appeals found the language "the company will continue to cover" to be ambiguous when read in light of the total agreement. However, the court found that absent limiting language, the contract at issue expressed an intent to provide insurance coverage for the duration of retirement. In so holding, the Court of Appeals found that the benefits at issue in *American Pad,* were benefits which "vested" when service to the company was fully performed. *Id.* at 428. However, the court distinguished other benefits under the subject agreement as being limited in duration by contract language which stated that the health insurance would "continue in full force for the duration of the agreement." *Id.* at 428, n. 3.

In the instant case, paragraph 3 of Article XII of the Local 1215 Agreement specifically provides that those benefits listed in subparagraphs "will continue for the duration of the 1981–1984 Agreement." Additionally, the Agreement as a whole is limited by Article XVIII of the Local 1215 Agreement which limits the duration of the Agreement to September of 1984. Based on paragraph 3 of Article XII and on Article XVIII of the 1981 Local 1215 Agreement, I find that *American Pad,* favors defendant's interpretation of the instant Agreement.

Plaintiffs contend that by its own terms, paragraph 3 of Article 12 only applies to "modifications" of existing benefits. Therefore, plaintiffs contend the court must look elsewhere in the contract to determine what benefits retirees retained. Plaintiffs assert that paragraph 2 of Article XII establishes that benefits prevailing at the expiration of the 1977 Agreements would continue to be provided to retirees. Even assuming that benefits mentioned in paragraph 2 are not governed by the durational language of paragraph 3 of Article XII, the promise to continue existing benefits in paragraph 2 extended only "through December 1, 1984." Consequently, I find no indication that the 1981 Agreements between the parties provided lifetime insurance benefits.

Plaintiffs have cited to the court a number of cases in which courts have found retirement benefits to be "vested" for the duration of retirement. *See American Pad, supra; UAW v. Cadillac Malleable Iron Co.,* No. 82–75 (W.D.Mich. April 20, 1982). As noted earlier, the benefits in issues in *American Pad* were, unlike the present case, not subject to any durational provisions. In *Cadillac Malleable,* the court found that language in the agreements stating that the company "will pay" the cost of retiree benefits provided lifetime benefits for retirees. In that case, the labor agreements did not contain language limiting the duration of the benefits at issue. Additionally, the court in *Cadillac Malleable* was aided in its construction of those agreements by testimony of retirees who stated that Company representatives had repeatedly informed retirees that their benefits were for life. Moreover, the defendant in *Cadillac Malleable* had sent letters to retirees implying that benefits were for life. Slip Op. at 13–14. In the instant case, the Agreements at issue specifically contain language which limits benefits to the term of the Agreements. Additionally, this court heard no evidence which credibly suggested that the parties themselves viewed the Agreements at issue as providing lifetime benefits. Consequently, the precise holdings of *American Pad* and *Cadillac Mallea-*

*ble* are inapposite to the instant case. The interpretation of the instant Agreements as limiting retiree benefits to the term of the Agreements is bolstered by the fact that insurance coverage in the instant case was unitary coverage. The undisputed testimony of defendant's expert established that group insurance which rests upon the insurability of the entire group would almost be unobtainable for a group limited to retirees. This fact has been consistently viewed by courts as evidence that retiree benefits were not intended to extend beyond the duration of collective bargaining agreements. *Metal Polishers Local No. 11 v. Kurz-Kasch Inc.,* 538 F.Supp. 368 (S.D.Ohio 1982); *United Cork, Linoleum and Plastic Workers of America v. Lee National Corp.,* 323 F.Supp. 1181 (S.D.N.Y.1971).

Plaintiffs have also contended that the instant agreement must be read as granting lifetime benefits because a retired worker has completed his service to his employer, retirement benefits are necessarily viewed as deferred payment for services rendered. As such, plaintiffs contend, those benefits are not subject to forfeiture. *See Pittsburgh Glass, supra.* I find plaintiffs' contention to be an accurate statement of law, however, I disagree with the scope that plaintiffs accord their proposition. Although benefits obtained by retirees may "vest" upon retirement, the benefits that vest must stem from the agreement in issue. Determining the scope of vested rights turns upon an interpretation of contract in issue. *American Pad, supra.* In the instant case, because the benefits granted were subject to specific durational language, the contested benefits were transitory and limited to the term of the Agreements. *See Turner v. Teamsters Local 302,* 604 F.2d 1219 (9th Cir.1979).

Plaintiffs also contend that federal labor policy mandates an implied obligation that retiree insurance benefits survive the duration of a Collective Bargaining Agreement. Although this presumption exists with respect to pensions under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.,* this stat-

utory vesting principle only applies to pension plans and not to health and life insurance benefits. 29 U.S.C. § 1051(1). Indeed courts that have considered this distinction have recognized that insurance plans are generally viewed as limited to the duration of a collective bargaining agreement. *Turner, supra; Metal Polishers, supra.* In the instant case, having considered the entire record before me and upon reviewing the instant Agreements, I find that plaintiffs have not met their burden of establishing that the Agreements in existence at the time of Roblin's cessation of operations provided lifetime retiree insurance benefits.

Plaintiffs contend that the 1981 Agreements could not have limited retiree benefits to the duration of the instant agreements because such an interpretation would be illegal. Plaintiffs position stems from the Supreme Court statement that "vested retirement rights may not be altered without the pensioner's consent." *Pittsburgh Glass, supra,* 404 U.S. at 181, n. 20, 92 S.Ct. at 398, n. 20. Plaintiffs contend that lifetime retirement benefits were granted in 1965 and carried forward in subsequent agreements. Accordingly, plaintiffs assert that those benefits may not be altered.

■ Under paragraph 7(a) of the 1965 Insurance Agreement, retired employees were provided with the same coverage as was provided to active employees. Paragraph 7(b) of that Agreement provided that retiree coverage terminated upon the death of the retiree. Notwithstanding these provisions, the preamble to the Insurance Agreement stated that the coverage listed in the Agreement would be provided for the duration of the Agreement. I find that the conflicting language of these provisions make this Insurance Agreement ambiguous. Consequently, in interpreting this Agreement, testimony regarding the parties' intent is properly before the court. *Local 783, Allied Industrial Workers v. General Electric Co.,* 471 F.2d 751 (6th Cir.1973); *International Association of Machinists v. Sargent Industries,* 522 F.2d 280 (6th Cir. 1975).

■ Based on the record before the court, I am satisfied that the parties in the instant case did not intend to confer lifetime benefits for retirees in the 1965, or any subsequent, Agreements.

Mr. Ruttenberg's testimony, which I credit, when viewed in conjunction with the total absence of any mention of lifetime benefits in any Union documents, strongly suggests that the parties never contemplated lifetime retiree benefits. Such an insurance plan would have been contrary to Ruttenberg's theories of not committing a company beyond its resources; particularly when, in 1965, United Steel was on the verge of liquidation. Additionally, it is inconceivable to the court that any such major benefit, newly obtained in 1965, would not have been mentioned in the Union's benefit summary to the membership during the contract ratification process. Moreover, the unitary nature of the coverage provided in the 1965 Insurance Agreement suggests that benefits granted were transitory and limited to the duration of the Agreement. *See Lee National, supra.*

With respect to plaintiffs' contention that all benefits were automatically carried forward into subsequent Agreements, I find that, even assuming this position to be correct, subsequent Agreements only carried forward what existed in prior Agreements; that is, insurance benefits which were limited to the term of prior Agreements. Additionally, the evidence before the court shows that the parties themselves considered all benefits in prior Agreements to be proper subjects of collective bargaining at the expiration of any Agreement. Not only did the parties find it necessary to insert contract provisions to provide for continued coverage during periods when no new agreements were in effect (see paragraph 2, Article XII of 1981 Local 1215 Agreement) but also the parties specifically included agreed-upon retiree benefits as being contingent upon reaching agreement on other matters. (See Defendant Exhibit 13.) Such conduct would be totally unnecessary had the parties themselves viewed retiree benefits as being vested for life. Accordingly, I find that plaintiffs have not met their burden of establishing that the Agree-

ments in issue provided lifetime retiree insurance benefits.

## CONCLUSION

In conclusion, upon review of the entire record, I find that the durational language contained in the 1981 Agreements between the parties limited retiree benefits to the term of the Agreements or the cessation of business operations. This is clearly the case with respect to health insurance. With respect to retiree life insurance, I find that in reading the contract as a whole, paragraph 3(h) of Article XII provides a schedule of benefits for retirees which reaches a floor or base level of benefits after three years of retirement.

In addition, I find that upon reviewing the 17-year bargaining history of the instant Locals, I am unable to find that the parties ever agreed on or intended to grant lifetime insurance benefits for retirees. In the absence of such intent or agreement, I am unable to impose such an uncontemplated obligation upon defendant Roblin. Accordingly, I find that plaintiffs have not met their burden of establishing that retiree insurance benefits survived defendant's cessation of operations.