**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS LODGE NO. 1194 et al., Plaintiffs-Appellees,**

v.

**SARGENT INDUSTRIES et al., Defendants-Appellants.**

No. 74–2221.

United States Court of Appeals, Sixth Circuit.

July 28, 1975.

predecessor, Gar Wood Industries, Inc. (Gar Wood), made annual payments to an employee pension plan sufficient to comply with the terms of a pension agreement. A second question is the propriety of an attorneys' fee award in view of Appellees' success in litigating this matter.

In 1955 Gar Wood entered into a pension agreement with Appellee Union covering hourly workers at its Findlay, Ohio plant. The agreement was periodically amended, and the final version was effective between June 2, 1968 and June 1, 1971.

In January 1970, Sargent acquired Gar Wood. Shortly thereafter sales of the line of products produced at the Findlay plant declined, and in late 1971 the plant was closed. The Findlay pension plan was terminated as of October 31, 1971. At this time the pension fund contained approximately $250,000, but to guarantee full pension benefits to those employees with vested rights would have required approximately $1,030,000 of additional funding.

The funding language in the agreement was not amended during the sixteen years that the pension plan was operative.[1] According to Article I, Section

Robert B. Miller, Peter R. Taft, Munger, Tolles, Hills & Rickershauser, Los Angeles, Cal., Charles W. Peckinpaugh, Jr., Shumaker, Loop & Kendrick, Toledo, Ohio, for defendants-appellants.

E. Thomas Maguire, Robison, Curphey & O'Connell, Toledo, Ohio, Richard A. Betts, Findlay, Ohio, for plaintiffs-appellees.

Before EDWARDS, CELEBREZZE and MILLER, Circuit Judges.

CELEBREZZE, Circuit Judge.

The basic issue before us is whether Sargent Industries, Inc. (Sargent) and its

---

1. The following are relevant portions of the pension plan agreement:

    a) Art. I, § 2: "The company agrees that, during the term of this Agreement, it will make payments into the Pension Fund in amounts which shall be sufficient to *fund the benefits on a sound actuarial basis.*" (*Emphasis added.*)

    b) Art. I, § 3: " * * * The benefits of the Plan shall be only such as can be provided by the assets of the Pension Fund and there shall be no liability or obligations on the part of the Company to make any further contributions to the Trustee in the event of termination of the Plan. No liability for the payment of benefits under the Plan shall be imposed upon the Company, the officers, Directors, or stockholders of the Company."

    c) Art. I, § 4: "Upon termination or discontinuance of the Plan, the assets then remaining in the Pension Fund, after payment or provision for payment of all expenses properly chargeable thereto, shall be allocated for the purpose of paying the pension and

death benefits provided by the Plan (based on credited service to date of such termination or discontinuance), to employees who have retired or who would qualify to retire or for other benefits in the following order of precedence: First, to employees who shall have retired prior to such termination or discontinuance and their beneficiaries, without reference to the order of their retirement; Second, to employees who shall have become qualified to retire (but who have not retired) with benefits under the Plan prior to such termination or discontinuance and their beneficiaries, without reference to the order in which they shall have become so qualified to retire; Third, to employees with 10 or more years of credited service and former employees with vested deferred retirement benefits (provided such former employees responded within one year following the date of discontinuance to a written enquiry by the Company at the last known address shown in the records of the Company); and Fourth, to all other employees with a pension interest at date of termination of the

2 of the agreement the plan was to be funded "on a sound actuarial basis." The District Court concluded that this language was·ambiguous and resorted to parol evidence in the form of testimony by various Union and Company negotiators to determine the parties' understanding as to the meaning of "sound actuarial basis." The District Court determined that during the course of the plan the parties had agreed that the plan would be funded by annual Company contributions equal to the maximum deductible pension plan contribution allowed by the Internal Revenue Code, 26 U.S.C. § 401 (1970). Sargent and its predecessor, Gar Wood, had made sixteen annual contributions of the minimum deductible amount. The District Court ordered Sargent to pay an additional $685,901 into the fund to cover the difference between minimum and maximum deductible payments. The District Court, asserting its discretion, assessed attorneys' fees against Sargent in the amount of $99,385, in addition to costs and other expenses.

Sargent claims that the pension plan was properly funded through annual contributions and, therefore, that the District Court's order was improper. Sargent also contends that the award of attorneys' fees should be reversed.

■ The pension plan agreement was negotiated as part of and was appended to the collective bargaining agreement between Sargent and the Union. The Supreme Court in *Transportation Union v. Pacific R.R.,* 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), noted that it is proper to look to parol evidence when interpreting collective bargaining agreements. Resort to parol evidence is especially appropriate where, as here, the agreement uses general terminology ("fund the benefits . . . on a sound actuarial basis") not susceptible to precise definition.

As the Fourth Circuit noted in *Atlantic Coastline R.R. v. Brotherhood of Ry. Employees,* 210 F.2d 812, 815 (4th Cir. 1954):

Collective bargaining agreements like other contracts are to be given a· reasonable construction, not one which results in injustice and absurdity.

In *Kellogg Co. v. N.L.R.B.,* 457 F.2d 519, 524 (6th Cir. 1972), we quoted Mr. Justice Brennan's statement in a concurring opinion in *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 570, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960):

Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion.

In *Local 783, Allied Industrial Workers v. General Electric Co.,* 471 F.2d 751, 757 (6th Cir. 1973), we reiterated language from *Pekar v. Local 181, Brewery Workers,* 311 F.2d 628, 636 (6th Cir. 1962):

"[A labor contract] must be construed to give effect to the intent of the par-

---

Plan, but not beyond the value of such interest."

d) Art. IV, § 1: "Any modification or amendment of the Plan may be made retroactively with the consent of the Union, if necessary or appropriate, to establish the deductibility of the Company's contributions under the Internal Revenue Code as now in effect or hereafter amended or any other applicable provisions of the Federal Tax Laws, as now in effect or hereafter amended or adopted and the regulations issued thereunder."

e) Art. V: "The Company reserves the right to amend, modify or terminate the Plan by action of its Board of Directors, provided, however, that *no such action shall alter the Plan or its operation* (except as may be required by the Internal Revenue Service for the purpose of meeting the conditions required to established the deductibility for income tax purposes of all payments made by the Company hereunder) in respect of employees covered by this Agreement in contravention of the provisions of this Agreement." (*Emphasis added.*)

ties when it was made and the circumstances existing at the time it was made should be looked to to ascertain the intent."

■ Thomas M. Dant, a member of the accounting and actuarial firm retained by Sargent to analyze Gar Wood, testified that in his profession there is no recognized definition of the term "sound actuarial basis." Dant stated, "[T]here is no precise technical meaning of that term. It is rather loosely used, a vague type of word people use, but no precise meaning." Based on Dant's testimony the District Court properly concluded that it was "impossible to ascribe an objective standard to the language of the plan by which the parties intended to manifest their intent."

In order to resolve this ambiguity Sargent urges that we look to the past practice of the parties, namely, the Union's sixteen-year acquiescence to annual payments at the minimum deductible level. The District Court, however, chose to rely on the testimony of some of the individuals who negotiated the pension agreement and its various amendments.

Harvey L. Robison, a Union officer and Findlay plant negotiator in 1968–1969, testified that Joseph Hager, Jr., President of Gar Wood at the time, had assured him that even if the Company sold or closed the plant, the pension plan would be adequately funded to pay all the employees whose pension rights had vested by virtue of ten years' employment at the plant.

A. Walter Rensch, a Gar Wood employee for thirty years, retired in February, 1970, and at that time was assured by the Company's comptroller that his pension benefits of $121.32 per month would be "good as long as you live." Following the closing of the Findlay plant Mr. Rensch's monthly pension check was reduced from $121.32 to $46.05.

Philip Paxton, a Union officer and Findlay plant negotiator in 1965–1966 and in 1968–1969, testified that in 1968 he was assured by Company negotiators that the pension plan was being funded sufficiently to provide full benefits to current and future pensioners. The District Court noted that Sargent's actuary Mr. Dant, testified that had Gar Wood been funding the pension plan with the maximum annual deductible amount, the plan would have been fully funded by 1968 and the fund would have had proceeds sufficient to pay all pensioners the agreed amounts.

Based upon the above testimony, that of other witnesses, and extensive documentary evidence, the District Court made the following factual finding in resolving the meaning of the ambiguous language in the pension agreement:

The Court finds that throughout the continuing process of collective bargaining, agents of the defendant and its predecessor in interest repeatedly assured the plaintiffs that the admittedly ambiguous language in the plan (i. e., sound actuarial basis, fully funded, vested, etc.) were in reference to a program that allowed for maximum deductible (26 U.S.C., § 401 et seq.) contributions. It was in reliance on those assurances that the plaintiffs predicated their economic package acceptance.

■■ To overturn the District Court's interpretation of this agreement we must upon a review of the evidence be "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *quoted in Parmer v. National Cash Register Co.,* 503 F.2d 275, 277 (6th Cir. 1974). We are not convinced that a mistake has been made. Bearing in mind that its finding was based primarily on oral testimony and that the trial judge had the opportunity

to view the demeanor and to judge the credibility of the witnesses, we affirm the District Court's findings and the propriety of the award.

■ Appellant argues that the awarding of reasonable attorneys' fees was improper. The District Court issued a separate memorandum opinion discussing attorneys' fees and concluded that the District Court had a general discretionary power to award attorneys' fees in instances where it was just.

The Supreme Court's recent opinion in *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 1417 (1975), requires reversal on this point. Mr. Justice White, speaking for the majority, noted that the "American rule" is that the prevailing litigant is "ordinarily not entitled to collect a reasonable attorneys' fee from the loser." At 247, 95 S.Ct. at 1616. Under *Alyeska,* the only exceptions to this rule are that an award is proper where there is statutory authorization, where a fund benefiting others in addition to the successful litigant has been created or recovered, or where there has been bad faith or wilful disobedience of a court order by the losing party. As the *Alyeska* Court stated, Congress has not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." At 260, 95 S.Ct. at 1623.

Despite Appellees' vindication of an important national labor policy, namely, full and equitable funding of pension plans, therefore, the District Court's award of attorneys' fees must be reversed. We note that Appellees' counsel has a fee contract calling for the same amount as awarded by the District Court.

The District Court's $685,901 judgment against Sargent is affirmed, and the award of attorneys' fees is reversed.