**Donald L. WILLIAMS and Elsie D. Williams, Plaintiffs,**

v.

**WELLMAN THERMAL SYSTEMS CORPORATION, Wellman Health Care Program, Wellman Life Insurance Plan, John Doe and Richard Roe, Defendants.**

**No. IP 85–1709–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 14, 1988.

Carolyn A. Kaye, Williams, Taylor & Schmits, Indianapolis, Ind., for plaintiffs.

J. Lee McNeely, McNeely, Sanders & Stephenson, Shelbyville, Ind., for defendants.

## ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

TINDER, District Judge.

This dispute has been pending for more than two years. By way of good news, the parties are interested in resolving this matter as soon as possible. To that end, exhaustively briefed cross-motions for summary judgment were filed. Counsel also presented helpful oral arguments. As a result, some of the matters in question can now be resolved. As you may suspect, the bad news is that some material questions remain to be decided, and a trial will be necessary. Thorough briefs don't always cause long opinions, but the facts presented here and the absence of controlling precedent require a detailed explication of my reasoning.

The plaintiffs are a retired employee and his spouse who are residents of Indiana. They seek the continuation of certain employee welfare benefits at previous levels of rates of coverage under the jurisdiction of the Employee Retirement Security Act of 1974 ("ERISA"), 29 United States Code, section 1001 et seq. The plaintiffs also assert state law claims by reason of the court's pendent jurisdiction.

The defendants in this action include Wellman Thermal Systems ("Wellman"), a Delaware corporation doing business in Indiana, Wellman Health Care Program ("Health Care Program"), Wellman Life Insurance Plan ("Life Insurance Plan"), John Doe and Richard Roe. John Doe is one or more individuals who, by reason of his or her position with or control of the Health Care Program is or was a fiduciary there-

of, as defined by ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), prior to, on, or after July 1, 1985. Richard Roe is one or more individuals who, by reason of his or her position with or control of the Life Insurance Plan is or was a fiduciary thereof, as defined by ERISA section 3(21)(A), 29 U.S.C. § 1002(21)(A), prior to, on, or after July 1, 1985.

The plaintiffs' complaint comprises five counts. Counts I and II allege breach of fiduciary duty under ERISA with regard to the Health Care Program and the Life Insurance Plan. The plaintiffs ask for an injunction with respect to the Health Care Program and for a declaratory judgment regarding the benefits of the Life Insurance Plan. Counts III and IV allege a breach of federal ERISA contract with regard to the Health Care Program and the Life Insurance Plan and ask for an injunction with respect to the Health Care Program and for a declaratory judgment regarding the benefits of the Life Insurance Plan. Court V alleges a failure to give notice of nonpayment under Indiana Code section 22–2–12–4. The plaintiffs also pray for exemplary damages due to the allegedly willful and oppressive nature of the defendants' conduct, attorney's fees, actuarial and accounting fees, prejudgment interest and costs.

The primary issue of this action is whether certain retiree benefits extend beyond the term of a collective bargaining agreement that was in force at the date of retirement. The other issues presented here are whether ERISA pre-empts the plaintiffs' state law claims and whether the retiree's wife, who is the beneficiary under the plans, has standing to sue. A review of the events and documents associated with this case is helpful to the understanding of the dispute.

1. Plaintiffs believe that Donald Williams retired on March 19, 1980. Defendants maintain that Williams was on disability leave of absence until February 1, 1981, at which time his disability retirement was effective. The difference is not material in determining liability because the

## *Facts*

Prior to August 13, 1979, the General Electric Company ("GE") owned and operated a manufacturing plant in Shelbyville, Indiana. The plaintiff, Donald L. Williams, began working at the Shelbyville plant in 1965. On July 10, 1979, GE contracted to sell the plant to the defendant, Wellman, pursuant to an Asset Purchase Agreement, effective August 13, 1979. After the sale, Donald Williams continued working for Wellman until either March 19, 1980, or February 1, 1981,[1] when he retired due to mental disability. (Plaintiffs' Complaint at 5.) During the time Williams worked for GE and Wellman he was a member of the United Automobile, Aerospace and Agricultural Implement Workers of America, U.A.W. Local 1793 (the "Union").

The Union and GE entered into a collective bargaining agreement ("CBA I") for the period from July 23, 1979 to July 18, 1982. (Beginning at A–221.[2]) Under CBA I, GE agreed to provide certain welfare benefits to GE employees who were Union members. Section 1 of Article XXIII, entitled "Benefit Plans," in CBA I, states that:

> For the term of this Agreement, the Company will make available to employees in the bargaining unit the provisions of the Company's benefit plans, as amended, and as they are made available generally to other employees of the Company. These plans are entitled respectively as follows:
> (1) General Electric Insurance Plan with Comprehensive Medical Expense Benefits
> (2) General Electric Pension Plan
> (3) General Electric Emergency Aid Plan
> (4) General Electric Personal Accident Insurance Plan
> (5) General Electric Income Extension Aid Plan (Article XXII)
> (6) General Electric Savings and Security Program

same collective bargaining agreement was in effect on both dates.

2. Since both parties are using the page numbering system of the Plaintiff's Summary Judgment Appendix to designate documents, the court will do the same.

(7) General Electric Individual Development Program

(8) General Electric Employee Product Purchase Plan

(9) General Electric Suggestion Plan

(10) General Electric Long Term Disability Income Plan

(A–272.) The benefit plans referred to were not set forth specifically in CBA I; they were described in separate GE plan documents. (A–43 to A–88.) In those documents, the section entitled "Amendment or Termination" provided as follows:

This Plan may be amended, suspended, or terminated by the Board of Directors, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and *except further that no such amendment, suspension, or termination shall adversely affect to a material degree any benefit payable with respect to any sickness, injury, or expense incurred prior to the effective date of such amendment, suspension, or termination, or affect the amount of life insurance and/or Trust Death Benefits for those employees who have retired,* as described on page 3.

(GE Insurance Plan, as Amended July 1, 1979, at A–79, emphasis added.)[3]

At page 3 (A–70) the section entitled "Benefits after Retirement or Termination of Employment at Age 65 or Later" provides in part:

If you retire from the Company on pension prior to age 65, or if you leave the service of the Company after you are entitled to optional retirement under the Company's Pension Plan, or if you leave on a retirement allowance granted by the Company, your Life Insurance will be continued in full force up to age 65.

With regard to the GE Medical Care Plan the section entitled "Covered Medical Expense Benefits after Retirement or Attainment of Age 65" states in part (A–75):

If you retire from the Company on pension prior to age 65, or if you leave the

service of the Company after you are entitled to optional retirement under the Company's Pension Plan, or if you leave on a retirement allowance granted by the Company, Comprehensive Medical Expense Insurance for yourself and for your covered dependents will be continued until the end of the month in which you reach age 65, provided you pay any required contributions.

The section entitled "Your Contribution For the Insurance Plan" states in part (A–76):

1. No contributions will be required for the full benefits of this Plan with respect to your employee coverage.

2. If you enroll for Comprehensive Medical Expense Insurance with respect to your dependents your contributions will be 2% of your normal straight-time annual earnings up to $5,000 of such earnings, a maximum contribution of $100 per year.

Only representatives of GE and the Union signed CBA I. In a letter dated June 6, 1979, to the president of the Union, however, Wellman expressed its intention to be bound by any agreements made between the Union and GE. (A–277.) And, in a Memorandum of Agreement, dated August 12, 1979, (A–279), representatives of GE, the Union, and Wellman signed a document, stating in part:

Subject to the "completion" of the "Asset Purchase Agreement" between the General Electric Company ("GE") and Wellman Incandescent, Inc. ("Wellman") with respect to GE's Industrial Heating Business Department ("IHB"), the parties hereto agree that the 1979–82 collective bargaining agreement between GE and Local 1793 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America—UAW ("Local 1793") shall be binding for its full term upon Wellman and Local 1793; provided that the benefit plans which would be available to the employees in the bargaining unit, to the

---

**3.** The January 1, 1979, GE Employee Benefits Plan Document contained similar language.

See A–56 and A–4.

extent that these employees would not then be covered by GE benefit plans, would be Wellman benefit plans comparable to the GE benefit plans referred to in the collective bargaining agreement between GE and Local 1793.

In contrast to CBA I (signed by GE and the Union), and the Memorandum of Agreement (signed by GE, the Union, and Wellman), the Asset Purchase Agreement for the Shelbyville plant was signed only by GE and Wellman.[4] In the Asset Purchase Agreement, Exhibit E, entitled "Benefit Programs," states in part (at A–89):

> This Exhibit E is an integral part of the Asset Purchase Agreement (the 'Agreement'), dated as of July 10, 1979, between General Electric Company ('GE') and Wellman Incandescent, Inc. ('Wellman').
>
> Wellman agrees, as provided in subparagraphs 7(a) and 7(b) of the Agreement, to offer employee benefit plans for Transferred Employees of GE that are comparable to those which were provided by GE on the Completion Date, such GE benefit plans being listed in paragraph 3 below.
>
> Wellman intends to continue the comparable benefit plans, described in said paragraph 3, to be adopted by it for an indefinite period, but *Wellman must reserve the right to alter, amend, or terminate any particular plan or plans in the future* depending on then prevailing circumstances, its financial condition and other presently unforeseeable events....

(Emphasis added.) The Asset Purchase Agreement is the only document brought to the attention of the court where Wellman specifically reserves the right to alter, amend or terminate benefit plans.

At the time of his retirement (in either 1980 or 1981) Donald Williams was either forty-one or forty-two years old and began receiving a disability pension from Wellman. No dispute exists as to the pension; the benefits at issue concern the Health Care Program and the Life Insurance Plan.

**4.** The Index to the Asset Purchase Agreement begins on A–314. The Agreement itself begins

The parties agree that when Donald Williams retired he was a participant in both of those plans.

Wellman employees had access to a plan handbook entitled "What's Here for You?" (Beginning at A–130.) In the portion entitled "Basic Information on your Benefit Plans," the handbook states (at A–139):

> Each of the benefit plans has a legal document or contract. Should the wording of these sections and the plan documents disagree, the official document wording will govern. You may obtain a copy of the plan document upon written request or you can refer to copies of each plan document which are available in Employee Relations.

Neither party produced any "plan documents" other than the handbook. Consequently, the court must rely on the "What's Here for You?" handbook as the Wellman plan document.

Under the Wellman Health Care Program, the Medical Care Plan contains a section entitled "Participation in the Plan" which states in part:

> All regular active employees are eligible for Medical Care Plan protection. This does not include temporary employees, those hired on retainer, or other special employees. Coverage is effective on your first day of active work.
> *Wellman pay the full cost of this coverage for you.*

(A–146, emphasis added.) Immediately below "Participation in the Plan" the section entitled "Coverage for your Dependents" states that "You may also elect to purchase Medical Care Plan coverage for your dependents." In an "Eligibility–Cost Chart" (at A–140) the amount listed in the "Cost" column for the Health Care Plan presumably refers only to dependents:

> 2% of first $5,000 of earnings, up to $100 annual maximum, for dependents.

In the Medical Care Plan section entitled "When Coverage Ends," a subsection entitled "Termination of Employment" provides (A–150) that:

on A–316. The signatures are on A–341, dated 7/10/79.

Coverage will end on the date your employment ends (*other than for retirement, which is explained separately*), but will be continued by the Company for up to one year in case of a plant closing, as long as you have at least three years of continuous service. Otherwise, you must make the required contributions in advance.

Coverage will end for your dependents if you do not make the required contributions at any time.

(Emphasis added.)

The Wellman "Pensioners' Health Plan" (A–151) provides that:

Coverage will continue for you and your covered dependents as long as you make the required contributions. However, your coverage will end at the end of the month in which you reach age 65 if you

retire from the Company before age 65

leave the Company after you are entitled to an optional retirement

leave on a retirement allowance granted by the Company.

Should you or a dependent be totally disabled at the end of the month in which you reach age 65, coverage will continue as described under When Coverage Ends.

This part of the Pensioners' Health Plan does not have its own "When Coverage Ends" section. Presumably the "When Coverage Ends" section being referred to is the one in the Medical Care Plan which immediately precedes the Pensioners' Health Plan section and which states (at A–150):

When Coverage Ends

Continuation of coverage for you or a covered dependent is limited in the following cases:

Total Disability—Your coverage will remain in effect for up to one year (18 months for a job-related disability) as long as you are totally disabled for one week or more and your continuity of service with the Company is maintained. Contributions for your dependent coverage will be paid by the Company during this period.

Benefits for medical expenses connected with a total disability will be payable up to the end of the calendar year after the year in which such insurance is discontinued, as long as the total disability continues.

The "When Coverage Ends" provisions for the several distinct parts of the Wellman plans are not identical. The language concerning retirement in the "Weekly Sickness and Accident Insurance Plan" states (at A–165):

When Coverage Ends

.     .     .     .     .

*Retirement—Your coverage ends when you retire.*

(Emphasis added.) The "When Coverage Ends" provision of the "Long Term Disability Insurance Plan" section provides that (at A–166):

Your LTDI Plan coverage will end when you reach age 64½, unless you are totally disabled, in which case coverage continues until the end of the month in which you reach age 65. Coverage ends at age 69½ if you work past age 65. Coverage will also end if you refuse any required medical exams, or if you are no longer an eligible employee.

The subsection under the "Personal Accident Insurance Plan" section states that (at A–168–69):

When Coverage Ends

Retirement—Your coverage will end at the end of the month in which your retirement becomes effective, and any unused portion of your advance payments will be refunded to you.

The "Personal Accident Insurance Plan" is also described later in the handbook (at A–178–79) in the "Survivor Security" portion. In that section, the "When Coverage Ends" provision states that (at A–179):

Retirement—Your coverage will end 31 days after you end your active employment, and any unused portion of your advance payments will be refunded to you.

In the handbook, Wellman gave its employees the following information about the Life Insurance Plan (at A–174):

Wellman provides, at no cost to you, life insurance coverage to help protect your family from sudden financial burdens that may accompany your death.

Eligibility and Cost

You are eligible to participate in the Life Insurance Plan if you are a regular hourly or non-exempt salaried employee. This does not include temporary employees, those hired on retainer, or other special employees. Your coverage will become effective on your first day of active work.

The full cost of your Life Insurance Plan coverage is paid by Wellman.

.    .    .    .    .

Coverage After Retirement (at A–175)

Your full amount of Life Insurance will be continued—free of charge to you—until you reach age 65. This applies even if you:

retire from the Company on pension before age 65

leave the Company after you are entitled to optional retirement under the Pension Plan

leave on a retirement allowance granted by the Company.

The amount of your insurance, however, will be reduced by 2.5% of the total on the first of each month following your 65th birthday. These reductions will continue until the amount of insurance is equal to the ultimate amount shown in the following chart: [chart is omitted here]

.    .    .    .    .

When Coverage Ends (at A–175–76)

Continuation of your Plan coverage is limited in the following cases:

Total Disability—Your coverage will remain in effect for up to one year (18 months for a job-related disability) as long as you are totally disabled for one week or more and your continuity of service is maintained. This also applies to pregnancy disability. At age 65, coverage will be reduced as explained under Amount of Coverage.

If you become totally disabled before age 60 while covered under this Plan, your Life Insurance will be continued, free of charge to you, until the end of the month in which you reach age 65, as long as you provide proof of your continuing disability.

From July 23, 1982, to September 19, 1982, the Union struck the Wellman plant in Shelbyville. No collective bargaining agreement was then in effect, CBA I having expired. The Wellman Medical Care Plan and the Life Insurance Plan have "strike" provisions that state (at A–150 and A–176):

Strike—Coverage for you and your dependents will end on the day before your first full day's absence from active work. However, the Company may, at its discretion, arrange to continue coverage under this Plan during such strike.

The parties do not dispute that during the strike, Wellman discontinued welfare benefits for striking employees but continued to pay such benefits for retired members of the Union.

Wellman and the Union reached a new collective bargaining agreement (CBA II) effective from September 19, 1982, to April 22, 1985. (Beginning at A–280.) Life insurance coverage for all employees under CBA II was set at $25,000. (A–309.) In a communication dated May 17, 1984, however, Wellman represented that the life insurance coverage for Donald Williams to age sixty-five was $31,362.62. (A–128.)

After CBA II expired, Wellman and the Union negotiated another agreement (CBA III), effective July 1, 1985. Pursuant to the modifications of CBA III, Wellman notified Donald Williams on June 19, 1985, that beginning July 1, 1985, his benefits under the Health Care Program and the Life Insurance Plan would be reduced. That communication informed all Wellman pensioners that (at A–125):

Effective July 1, 1985:

(a) All retirees' life insurance will be ten thousand dollars ($10,000).

(b) Retirees and their dependents shall be placed under a separate insurance pool in order to establish the cost of retiree/dependent contribution of twen-

ty-five percent (25%) of the cost of their retiree/dependent insurance.

(c) Insurance coverage shall terminate at the end of the month in which the retiree reaches age sixty-five (65).

For those retirees presently with group health insurance benefits under Blue Cross/Blue Shield, the following changes will be made effective July 1, 1985.

(a) The cost containment package known as "Cost Guard" will be instituted. This package is described in a separate Blue Cross/Blue Shield brochure and in meetings today.

(b) Prescription drug program is increased to five dollar ($5.00) deductible.

(c) Changes described previously.

For those retirees presently with group health insurance benefits under Metropolitan Life Insurance Company, your health insurance will change to the Blue Cross/Blue Shield plan described above effective July 1, 1985. A separate book describing this insurance plan is available for you.

The above communication did not list specifically the actual cost changes in the group health insurance benefits; however, a communication dated June 27, 1985, (A–123), informed Donald Williams that effective July 1, 1985, "all pensioners' contributions to medical insurance will be 25% of their insurance cost." The monthly cost to Donald Williams for the medical insurance would be $36.83. In another communication dated June 27, 1985, (A–124), Wellman notified Donald Williams that as of July 1, 1985, his life insurance coverage in the amount of $31,363.00 under the Wellman group policy would cease (except for a continuation of coverage for thirty-one days following the termination date).

Originally, the plaintiffs sued not only on their own behalf but on behalf of a class similarly situated. They also named GE as a defendant. The district court denied the plaintiffs' motion to maintain this suit as a class action and granted a joint motion to dismiss GE as a defendant without prejudice.

The plaintiffs' complaint asserts that as of Donald Williams' disability retirement date, the Health Care Program specifically provided coverage, without cost to the retiree, at certain benefit levels through a group insurance policy issued by Metropolitan Life Insurance Company. The plaintiffs also assert that as of the date that Donald Williams retired, the Life Insurance Plan provided that in the event of disability retirement, the disabled retiree was entitled to lifetime continuation, at Wellman's expense, of the life insurance coverage, with certain reductions after age sixty-five.

The plaintiffs allege that the reductions Wellman seeks to impose on retiree participants in the plans materially and adversely affect them. In addition to the reduction of life insurance benefits from $31,362.62 to $10,000, with the retiree contributing 25% of the premium, the adoption of the new health care plan effects more benefit cuts and further hurts the plaintiffs. The plaintiff Elsie Williams, beneficiary under the plans, asserts that she declined employment because she must care for her husband on a twenty-four hour basis; the benefit reductions make the treatment required for Donald Williams' mental disability too costly to pursue.

Wellman responds by asserting not only that it had no obligation to extend retiree benefits beyond the term of the collective bargaining agreement, but that federal law pre-empts Donald Williams' state law claims and that Elsie Williams has no standing to sue. Both parties seek resolution of this case through summary judgment.

As discussed below, the general issue of whether these retiree benefits extend beyond the term of the collective bargaining agreement (CBA I) is not appropriately resolved by summary judgment. Summary judgment is warranted, however, for the issues of pre-emption and standing.

*Conclusions of Law and Discussion*
*The Duration of Retiree Welfare Benefits*

■ A grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). After examining the facts and related documents in this case, this court concludes that ambiguities regarding the intended duration of retiree benefits preclude an overall grant of summary judgment.

The benefits at issue here are provided for by an "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(1) and (3). ERISA allows a plan participant or beneficiary "to recover benefits due to him under the term of the plan." 29 U.S.C. § 1132(a)(1)(B). This court has jurisdiction of this action pursuant to 29 U.S.C. § 1132(e)(1).

ERISA is a " 'a comprehensive and reticulated statute,' which Congress adopted after careful study of private retirement pension plans." *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)). The purpose of ERISA is

> to prescribe minimum vesting and accrual standards for qualifying employee retirement benefit plans; to establish minimum rules for employee participation and plan funding; to delineate fiduciary standards for plan managers; and to otherwise ensure that legitimate employee pension expectations are not defeated.

*Phillips v. Amoco Oil Co.,* 614 F.Supp. 694, 709 (N.D.Ala.1985), *aff'd,* 799 F.2d 1464 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 500 (1987) (citing *Alessi,* 451 U.S. at 511, 101 S.Ct. at 1900); *accord Anderson v. Alpha Portland Industries,* 836 F.2d 1512 (8th Cir. 1988).

ERISA divides employee benefits covered by the Act into two categories: (1) pension benefits ...; and (2) all other benefits (including, for example, medical and disability). 29 U.S.C. § 1002(1)–(2). The Act terms the second category 'welfare' benefits.

*Phillips,* 614 F.Supp. at 709; *accord Young v. Standard Oil,* 660 F.Supp. 587, 596 (S.D.Ind.1987). ERISA imposes certain disclosure and reporting requirements and certain fiduciary obligations for both categories of benefits. *Phillips,* 614 F.Supp. at 709. For pension plans, ERISA imposes minimum requirements for the funding of, the participation in and the vesting of benefits. *Id.* For the category of welfare benefits, however, the minimum funding, participation, and vesting requirements do not apply. *Id.; Anderson,* 836 F.2d at 1516; *Hansen v. White Motor Corp. (In re White Farm Equipment Co.),* 788 F.2d 1186, 1193 (6th Cir.1986); *Young,* 660 F.Supp. at 596. "ERISA does not require that such benefits be vested and nonforfeitable." *Phillips,* 614 F.Supp. at 710. "ERISA ... does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987). "Accordingly, an employee's inchoate 'interest' in welfare benefits may be terminated if his employment is terminated or if the benefit plan is amended or abolished before he becomes eligible for benefits under the terms of the existing plan." *Young,* 660 F.Supp. at 596.

Despite Congress' exclusion of welfare benefit plans from the stringent vesting requirements applicable to pension plans, "the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated." *White Farm Equipment,* 788 F.2d at 1193. The Court of Appeals for the Eighth Circuit reasoned that:

> The exemption from ERISA's vesting requirements does not prohibit an employer from extending benefits beyond the expiration of the collective bargaining agreement. Rather, the exemption allows the parties to determine the duration of the welfare benefits.

*Anderson,* 836 F.2d at 1516. Other courts have similarly held. *E.g., District 29, U.M. W.A. v. Royal Coal Co.,* 768 F.2d 588, 590 (4th Cir.1985); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Local 134 v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). "[T]he intent of the parties, as primarily evidenced by the collective bargaining agreement, controls the continuation of retiree welfare benefits beyond the agreement's termination." *White Farm Equipment,* 788 F.2d at 1192 (citing *Yard–Man,* 716 F.2d at 1479).

If the parties clearly express their intent in their documents, no genuine issue of material fact would preclude a grant of summary judgment. In the present case, however, an examination of the written evidence shows that the parties use different portions of the documents to support opposite interpretations of whether or not retiree benefits continue.

To support its position that the Union and GE did not intend to provide for benefits past the expiration of their collective bargaining agreement, Wellman focuses on the explicit language of CBA I:

*For the term of this Agreement,* the Company will make available to employees in the bargaining unit the provisions of the Company's benefit plans, as amended, and as they are made available generally to other employees of the Company.

(A–272, emphasis added.)

On the other hand, the plaintiffs make their argument, not from the words of the actual collective bargaining agreement, but from language in the GE plans. As mentioned in the Facts section, supra, the plans are listed within the body of CBA I but are set forth in separate documents. This court believes that because CBA I refers explicitly to the benefit plans by name, the terms of those plans become part of the collective bargaining agreement for the limited purpose of determining the benefits for which the parties contracted. *See, e.g., Guerini Stone Co. v. P.J. Carlin Con-*

*struction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916) (The subcontract referred to drawings and specifications in the general contract. Those drawings and specifications (but only those) were deemed to be part of the subcontract.); *J.S. & H. Construction v. Richmond County Hospital Authority,* 473 F.2d 212, 213 (5th Cir.1973) (subcontract incorporated by reference the "General Conditions" of the prime contract); *Rehart v. Clark,* 448 F.2d 170, 174 (9th Cir.1971) (reference to training program in an extension of enlistment agreement made training program part of the agreement).

The plaintiffs rely, in part, on language from the GE Insurance Plan with Comprehensive Medical Expense Benefits which provides that:

If you retire from the Company on pension prior to age 65, or if you leave the service of the Company after you are entitled to optional retirement under the Company's Pension Plan, of if you leave on a retirement allowance granted by the Company, *Comprehensive Medical Expense Insurance for yourself* and for your covered dependents *will be continued until the end of the month in which you reach age 65,* provided you pay any required contributions.

(A–75, emphasis added.) The "contributions" apply to coverage for dependents. For the employee, "[n]o contributions will be required for the full benefits of this Plan with respect to your employee coverage." (A–76.)

At this point two questions arise. The initial question is whether the agreement between GE and the Union was specific enough to determine the duration of retiree coverage. The passages just quoted suggest that the documents are unclear on the issue. The second question is whether Wellman, as successor to GE, did anything to clarify the muddle.

Starting with the first question, a further examination of the collective bargaining agreement documents adds to the uncertainty. As stated in the Facts section, supra, one part of the GE plan reserved the company's right to change the benefits:

This Plan may be amended, suspended, or terminated by the Board of Directors, in whole or in part, at any time without limitation, except as may be otherwise provided in collective bargaining agreements and *except further that no such amendment, suspension, or termination shall adversely affect to a material degree any benefit payable with respect to any sickness, injury, or expense incurred prior to the effective date of such amendment, suspension, or termination, or affect the amount of life insurance and/or Trust Death Benefits for those employees who have retired,* as described on page 3.

(A–79, referring to A–70, emphasis added.) Note that GE's power to change is curtailed in two important areas. First, GE may not reduce the amount of benefits payable with respect to a sickness if that sickness occurred before the change in the Plan. Second, GE may not reduce the amount of life insurance benefits payable on behalf of those already retired. The plaintiff, Donald Williams, became mentally disabled and retired before the plan was changed. It is not clear, however, whether the mental disability from which Donald Williams suffers qualifies as a "sickness" under the plan. Does "sickness" include mental illness? Does the plan or the agreement require that the afflicted person be treated prior to the amendment and produce proof of treatment? Resolution of this issue is not provided on the face of the agreement or in the plan.

Turning to the second question, Wellman's own documents do little to resolve the uncertainty. For example, Wellman did reserve the right to change the plan in the Asset Purchase Agreement between Wellman and GE (at A–341); however, as stated in the Facts section, supra, the Asset Purchase Agreement was signed only by the representatives of Wellman and GE. The court has no evidence before it to show that the Union or employees knew of the specific language within the Asset Purchase Agreement reserving such a right. Nor, as also stated in the Facts section, supra, does Wellman point to any part of Wellman's own plan documents wherein the company reserved its right to change or terminate the plan. This is significant because it suggests that the Union and employees were not privy to any departure from the GE reservation of rights language (with its own limitations) as they would be if such a reservation of rights were expressed in the Wellman plan. Wellman's intention in both the letter to the president of the Union (A–277) and in the Memorandum of Agreement (A–279) to offer benefits "comparable" to those of GE gave no indication of a possible reservation of rights to change or terminate the plan. Further consideration of extrinsic evidence is necessary to resolve the ambiguity.

The Seventh Circuit lacks precedental case law with respect to the resolution of disputes over the provision of retiree welfare benefits. Case law from other jurisdictions advises that once a court deems an agreement of this type to be ambiguous, the court may examine other evidence to determine the parties' intent. The Sixth Circuit did so on at least two occasions: *International Association of Machinists & Aerospace Workers Lodge No. 1194 v. Sargent Industries,* 522 F.2d 280, 282 (6th Cir.1975) (citing *Transportation Union v. Pacific R.R.,* 385 U.S. 157, 161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966)); *Local 783, Allied Industrial Workers v. General Electric Co.,* 471 F.2d 751, 757 (6th Cir. 1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973) ("After a finding of ambiguity has been made, '[e]vidence of the surrounding circumstances and the practical construction of the parties is admissible to aid in its interpretation.'") (quoting *Tennessee Consolidated Coal Co. v. U.M.W.A.,* 416 F.2d 1192, 1198 (6th Cir. 1969)), *cert. denied,* 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970) (citations omitted).

The Court of Appeals for the Eighth Circuit said,

It is axiomatic that when interpreting a contract, or in this case a CBA, we must begin by examining the language of the documents which form the basis of the agreement. "[I]f the contract is deemed ambiguous, then the court may

weigh extrinsic circumstances to aid in its construction."

*Anderson,* 836 F.2d at 1517 (quoting *UFCW Local 150-A v. Dubuque Packing Co.,* 756 F.2d 66, 69 (8th Cir.1985)) (citation omitted).

The Court of Appeals for the Ninth Circuit made a similar finding. In deciding whether the district court's grant of summary judgment was proper, the Ninth Circuit found that "[t]he labor-management agreement that endorses the [medical insurance] plan does have an expiration date, but the insurance program itself is not necessarily bound by this date. Thus, the contractual language does not explicitly address the issue before us." *Bower v. Bunker Hill Co.,* 725 F.2d 1221, 1223 (9th Cir.1984) (citation omitted). The court deemed the contract ambiguous: "[u]nable to resolve this lawsuit on the basis of contractual language, we look to extrinsic evidence...." *Id.* at 1223–24. Further, the *Bower* court said that:

> If insurance benefits are provided while no labor management agreement is in effect, and no other agreement between the employer and employees has been reached, the contract must be deemed ambiguous.

*Id.* at 1225. In the present case, as in *Bower,* benefits were not discontinued for retirees during the strike. The court in *Bower* concluded that "[i]t is improper to grant summary judgment before parol evidence on this issue has been heard." *Id.*

Another example of ambiguity appears in *International Union (UAW) v. Roblin Industries, Inc.,* 561 F.Supp. 288 (W.D.Mich. 1983), where the district court found a conflict in the language of an insurance agreement not unlike the one in the present case. The court decided that "the conflicting language of these provisions make[s] this Insurance Agreement ambiguous. Consequently, in interpreting this Agreement, testimony regarding the parties' intent is properly before the court." *Id.* at 300.

The court is persuaded by the cases above that a grant of summary judgment on the issue of the duration of retiree benefits would be improper where, as here, the court finds that the collective bargaining agreement is ambiguous. Consideration of extrinsic evidence is necessary to determine the intent of the parties. In construing the agreement, the court will be guided by principles that aid in the interpretation of contracts in general and collective bargaining agreements in particular.

The United States Supreme Court, albeit within a different context in the labor arena, has said the following about collective bargaining agreements:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. *John Wiley & Sons v. Livingston,* 376 U.S. 543, 550 [84 S.Ct. 909, 914–15, 11 L.Ed.2d 898 (1964)]; cf. *Steele v. Louisville & N.R. Co.,* 323 U.S. 192 [65 S.Ct. 226, 89 L.Ed. 173 (1944)]. "... [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... The collective agreement covers the whole employment relationship. It calls into being a new common law— the common law of a particular industry or of a particular plant." *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 578–579 [80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960)]. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.

*Transportation–Communication Employees Union v. Union Pacific Railroad Co.,* 385 U.S. 157, 160–61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966), *quoted in Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Brotherhood of Locomotive Firemen,* 397 F.2d 541, 545–46 (7th Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969); *and quoted in Illinois Central Railroad Co. v. Brotherhood of Locomotive Engineers,* 443 F.2d 136, 140 (7th Cir.1971). This language lends support to the practice of looking at other documents and at other aspects of the parties' relationship in order to interpret an

ambiguous collective bargaining agreement.

In *Yard Man,* 716 F.2d 1476, a case often cited on the subject of employee welfare benefits, the Court of Appeals for the Sixth Circuit provided the following guidance for interpreting collective bargaining agreements:

Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Id.* at 1479–80 (citations omitted).

Note that the interpretation of issues raised by an ambiguous collective bargaining agreement varies not only by the facts of each case but by circuit. The sixth circuit, for example, has drawn an inference that retiree welfare benefits continue throughout retirement regardless of when the collective bargaining agreement expired, although the inference alone is not dispositive. *See, e.g., Yard–Man,* 716 F.2d 1476. The Court of Appeals for the Eighth Circuit, however, disagrees with the sixth circuit's approach, and requires its plaintiffs "to prove their case without the aid of gratuitous inferences." *Anderson,* 836 F.2d at 1517. Of course, the actual construction of the agreement in this case must await consideration of all the extrinsic evidence at trial.

*Pre-emption of state law claims by ERISA*

██ The plaintiffs allege that when Wellman failed to pay certain benefits to Donald Williams under the plan, Wellman did not notify Williams within seven days of the nonpayment. Such a failure to notify is a violation of Indiana Code section 22–2–12–4(b). The plaintiffs now seek double damages, as provided by the state statute, for this violation. To sustain this portion of their claim, the plaintiffs assert that ERISA does not pre-empt the Indiana statute, citing *Fort Halifax Packing Co., Inc. v. Coyne,* — U.S. —, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Rather than supporting the plaintiffs' position, however, *Fort Halifax,* together with a clear reading of the Indiana statute, buttresses Wellman's argument in favor of pre-emption.

Title 29, United States Code section 1144(a) and (c) sets forth the mechanism for the pre-emption of state laws that encroach upon federal territory. With certain exceptions, ERISA pre-empts "all State law insofar as they ... relate to any employee benefit plan," "directly or indirectly." In *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the United States Supreme Court said that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 96–97, 103 S.Ct. at 2900.

A look at the Indiana statute shows that it purports to regulate employee benefit plans. Indiana Code section 22–2–12–4(a) provides that:

> This section applies to an employer who has contracted in writing to make payments to an employee welfare plan, vacation plan, health plan, dental plan, insurance plan, supplemental unemployment plan, benefit plan, profit-sharing plan, pension plan, industry plan, or any other employee plan either by agreement with an employee or an employee benefit plan group or by a collective bargaining agreement.

Section 22–2–12–4(b) provides that:

> Not later than seven (7) days after failing to make a payment under an agreement covered by subsection (a), the employer shall give written notice of non-payment to:
>
> (1) the employee on whose behalf the payment should have been made....

Section 22–2–12–4(c) provides that:

> An injured employee may recover double damages plus costs and attorney fees from an employer who fails to give notice under subsection (b) and who fails to make those payments described in subsection (a) on the employee's behalf.

Since the Indiana law in 22–2–12–4(a) subjects all of the enumerated plans and "any other employee plan" to the notice requirement of subsection (b), the statute "relates to" employee benefit plans on its face. It appears to be pre-empted by ERISA.

Despite the clear language of the ERISA statute, the plaintiffs would avoid pre-emption by asserting that the circumstances here are akin to those where the Supreme Court found that ERISA did not pre-empt a state law. The plaintiffs cite *Fort Halifax* for the proposition that "ERISA does not preempt a state law mandating certain one-time benefits by an employer to its employees in the case of a plant closing or relocation." (Reply Brief in Support of Plaintiffs' Motion for Summary Judgment at 8.) The plaintiffs apparently classify GE's sale of assets to Wellman as either a relocation or a plant closing. The plaintiffs conclude that the Indiana law is operating outside

the boundaries of ERISA as did the Maine law in *Fort Halifax.*

In Fort Halifax, the Supreme Court characterized the Maine statute as requiring that:

> any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years.

107 S.Ct. 2211, 2214. The Maine statute was not aimed at any "plan" but at a particular occurrence—a plant closing or relocation. In contrast, the benefits Williams seeks in the present case would be paid not as a result of Wellman's purchase of the plant but as a natural consequence of a claim for coverage under an employee benefit plan. While the plaintiffs are correct that the Indiana statute, like the Maine law in *Fort Halifax,* does not *mandate* a benefit plan, the Indiana statute explicitly "applies to" employee benefit plans and is thus a fair subject for pre-emption.

The plaintiffs argue, however, that:

> the Indiana statute merely requires that a notice be given if a payment is not made. This is analogous to the Maine statute as it does not impose an ongoing administrative burden on the employer. In fact, Indiana's requirement is far less burdensome to the employer than the one considered in *Fort Halifax.* Thus, the Indiana statute has not been pre-empted by ERISA....

(Reply Brief in Support of Plaintiffs' Motion for Summary Judgment at 8.) The issue, though, is not how burdensome a state law is but whether the law is attempting to regulate an area that is already controlled by federal legislation.

Plaintiffs do not describe, exactly, how Williams' sought-after payments qualify as "one-time benefits" similar to those in *Fort Halifax.* The Supreme Court's rejection of this type of argument with regard to death benefits, however, is instructive in the present case:

While death benefits may represent a one-time payment from the perspective of the beneficiaries, the employer clearly foresees the need to make regular payments to survivors on an ongoing basis. The ongoing, predictable nature of this obligation therefore creates the need for an administrative scheme to process claims and pay out benefits, whether those benefits are received by beneficiaries in a lump sum or on a periodic basis.

107 S.Ct. at 2219 n. 9. Payments to Donald Williams and others like him could continue for years. Such payments are not comparable to the one-time severance benefits paid pursuant to the Maine statute in the *Fort Halifax* case.

In *Fort Halifax,* the Supreme Court said the following:

We have not hesitated to enforce ERISA's pre-emption provisions where state law created the prospect that an employer's administrative scheme would be subject to conflicting requirements.

107 S.Ct. at 2216. The Court continued.

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.

*Id.* at 2217.

The notice requirement of the Indiana statute contravenes the federal policy. The Indiana statute would impose an additional administrative step in the operation of Wellman's employee benefit plan; Wellman would be required to notify the employee within seven days of its failure to make payment, a step not imposed by ERISA. This appears to be the type of state administrative requirement that ERISA was meant to preclude.

ERISA has a "saving clause," 29 U.S.C. § 1144(b)(2)(A), which exempts from pre-emption any state law regulating insurance, banking, or securities, but the plaintiffs advance no theory to rescue the Indiana statute under the clause. The Supreme Court has held that the saving clause did not exempt a state common law suit from pre-emption where the plaintiff alleged that the defendant had improperly processed a claim for benefits under an ERISA-regulated plan. The Court explained the rationale of pre-emption:

In sum, the detailed provisions of § 502(a) [29 U.S.C. § 1132(a)] set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. "The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly."

*Pilot Life Insurance Co. v. Dedeaux,* —— U.S. ——, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987) (quoting *Massachusetts Mutual Life Insurance v. Russell,* 473 U.S. 134, 147, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)) (emphasis in the original).

The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive. This conclusion is fully confirmed by the legislative history of the civil enforcement provision.

*Pilot Life,* 107 S.Ct. at 1557.

Therefore, in view of the reasoning behind pre-emption and the specific focus of

the Indiana statute on employee benefit plans, ERISA must pre-empt the Indiana law in this case. This court therefore now GRANTS in part the defendants' cross-motion for summary judgment with respect to the issue of pre-emption.

*Elsie D. Williams' Standing to Sue*

■ The defendants assert that the plaintiff Elsie D. Williams has no standing to sue. Under ERISA, however, Elsie Williams does meet the relevant standing requirements.

The civil enforcement section of ERISA, 29 U.S.C. 1132(a)(1)(B), provides that:

A civil action may be brought—

    (1) by a participant or beneficiary—

.   . .   .     .     .

    (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan....

A "beneficiary" is defined at 29 U.S.C. § 1002(8):

The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

Elsie D. Williams is a beneficiary, as that term is defined above, having been designated by her husband to receive benefits under his life insurance plan. As a beneficiary, Elsie Williams has standing to seek adjudication of this claim. Counsel for the defendants conceded this point at the oral argument. This court therefore DENIES in part the defendants' cross-motion for summary judgment on the issue of Elsie D. Williams' standing to sue.

### Conclusion

The court finds that, because the collective bargaining agreement between GE and the Union is ambiguous and the Wellman documents do nothing to clarify the ambiguity, summary judgment on the issue of whether the retiree welfare benefits extend beyond the term of the collective bargaining agreement is inappropriate. The court

must examine extrinsic evidence in order to construe the agreement.

For the reasons stated earlier, the court now GRANTS the defendants' cross-motion for summary judgment on the issue of pre-emption and concludes that the plaintiffs may not pursue remedies under the Indiana statute. The court DENIES the defendants' cross-motion for summary judgment on the issue of standing, concluding that Elsie D. Williams, as beneficiary of Donald L. Williams, has standing to bring this action.